Submitted on remand from the United States Supreme Court November 17, 2003,
on appeal, reversed and remanded with instructions to enter judgment on jury
verdict; affirmed on cross-appeal June 9, petition for review allowed
December 21, 2004 (337 Or 669)

Mayola WILLIAMS,
Personal Representative of the Estate of
Jesse D. Williams, Deceased,
*Appellant - Cross-Respondent,*

*v.*

PHILIP MORRIS INCORPORATED,
*Respondent - Cross-Appellant,*

*and*

RJ REYNOLDS TOBACCO COMPANY,
Fred Meyer, Inc.,
and Philip Morris Companies, Inc.,
*Defendants.*

9705-03957; A106791

92 P3d 126

James S. Coon, Raymond F. Thomas, Douglas A. Swanson, and Swanson, Thomas & Coon; William A.

Gaylord, and Gaylord & Eyerman, P.C.; and Charles S. Tauman, Maureen Leonard, Kathryn H. Clarke, and Bennett, Hartman & Reynolds for appellant - cross-respondent.

William F. Gary, Sharon A. Rudnick, James E. Mountain, Jr., and Harrang Long Gary Rudnick, P.C. for respondent - cross-appellant.

James N. Westwood, Scott E. Crawford, and Stoel Rives LLP, filed *amicus curiae* brief for Associated Oregon Industries.

David F. Sugerman, and Paul & Sugerman, P.C., and Steven C. Berman, filed *amicus curiae* brief for Alliance for Lung Cancer Advocacy, Support and Education; American Lung Association of Oregon; American Heart Association; American Cancer Society; and Oregon Trial Lawyers Association.

Thomas W. Brown, and Cosgrave Vergeer Kester LLP, and Robin S. Conrad, and National Chamber Litigation Center, Inc., filed *amicus curiae* brief for Chamber of Commerce of the United States of America.

Before Edmonds, Presiding Judge, and Armstrong and Wollheim, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

This case comes to us on remand from the United States Supreme Court. *Phillip Morris USA Inc. v. Williams*, 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003). We previously reversed the trial court's reduction of the jury's award of punitive damages on plaintiff's fraud claim and remanded the case with instructions to enter judgment on the verdict. We affirmed on defendant's cross-appeal. *Williams v. Phillip Morris Inc.*, 182 Or App 44, 48 P3d 824, *adh'd to on recons*, 183 Or App 192, 51 P3d 670, *rev den*, 335 Or 142 (2002). The Court thereafter granted defendant's petition for a writ of *certiorari*, vacated our decision, and remanded the case for reconsideration in light of its recent decision in *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*State Farm*). On remand, we reach the same result that we reached in our previous decision.

We readopt our previous opinion in all respects that are not superseded by our discussion in this opinion, including our statement of the facts and our resolution of issues of Oregon and federal law. Our failure to discuss any issue that defendant raises on remand indicates that we are satisfied with our previous resolution of that issue. We begin by summarizing the facts that we described in our previous opinion, again construing the evidence most favorably to plaintiff because of the verdict in her favor. These then are the facts that the jury could have found on the evidence before it.

Plaintiff is the widow of Jesse D. Williams (Williams) and the personal representative of his estate. Defendant is a leading manufacturer of cigarettes and currently has about half of the domestic market for that product. From the early 1950s until his death from a smoking-related lung cancer in 1997, Williams smoked defendant's cigarettes, primarily its Marlboro brand, eventually developing a habit of three packs a day. At that point, he spent half his waking hours smoking and was highly addicted to tobacco, both physiologically and psychologically. Although, at the urging of his wife and children, he made several attempts to stop smoking, each time he failed, in part because of his addiction.

Despite the increasing amount of information that linked smoking to health problems during that 40-year period, Williams resisted accepting or attempting to act on it. When his family told him that cigarettes were dangerous to his health, he replied that the cigarette companies would not sell them if they were as dangerous as his family claimed. When one of his sons tried to get him to read articles about the dangers of smoking, he responded by finding published assertions that cigarette smoking was not dangerous. However, when Williams learned that he had inoperable lung cancer he felt betrayed, stating "those darn cigarette people finally did it. They were lying all the time." He died about six months after his diagnosis.

In resisting the information about the dangers of smoking, Williams was responding to a campaign that defendant, together with the rest of the tobacco industry, created and implemented for the purpose of undercutting the effect of that information. During most of that campaign, the industry did not expressly assert that cigarettes were safe because it knew that it could never prove their safety. Instead, defendant and the industry attempted to make it appear that the evidence against cigarettes was sufficiently uncertain so that smokers would find a reason to justify their continued smoking. To achieve that result, defendant and the rest of the industry worked together for more than 40 years to create a public impression that there was a legitimate controversy about whether cigarettes were dangerous to a smoker's health and that resolving that health issue would require further research. Although defendant and the other companies knew throughout most, if not all, of that 40-year period that cigarette smoking was in fact dangerous, they intended that smokers rely on the false impression that the industry created.

The industry established its strategy and began developing its public image in response to a decline in cigarette sales in 1953 that was the apparent result of studies that showed that cigarette tar could cause cancer in mice and that established the existence of statistical correlations between smoking and lung cancer. The first public joint effort by the industry occurred in January 1954, when defendant and other tobacco companies published a joint statement in

448 newspapers throughout the country. In that statement, among other things, they announced the creation of the Tobacco Industry Research Committee (TIRC), one of whose stated goals was to conduct research into "all phases of tobacco use and health." In 1964, the year of the Surgeon General's report on the hazard of smoking to health, the industry divided the TIRC into two parts, one of which, the Council on Tobacco Research (CTR), continued to support scientific research. The other part, named the Tobacco Institute, focused on public relations and lobbying.

Between 1954 and the 1990s, those organizations developed and promoted an extensive campaign to counter the effects of negative scientific information on cigarette sales. The individual tobacco companies, including defendant, were part of the organizations and acted in cooperation with them. At first, the industry publicly denied that there was a problem; for example, in the 1950s and early 1960s, defendant's officials told the public that defendant would "stop business tomorrow" if it believed that its products were harmful. For most of that period, however, the industry did not attempt to refute the scientific information directly; rather, it tried to find ways to create doubts about it. The industry's goal was to create the impression that scientists disagreed about whether cigarette smoking was dangerous, that the industry was vigorously conducting research into the issue, and that a definitive answer would not be possible until that research was complete. As one of defendant's vice-presidents explained in an internal memo, the purpose was to give smokers a psychological crutch and a self-rationale that would encourage them to continue smoking. A Tobacco Institute internal memorandum similarly described the industry's purpose to provide smokers "ready-made credible alternatives" to the evidence of the dangers of smoking.

Both the industry as a whole and defendant acted consistently with those purposes. Among other things, they avoided developing contradictory information. Despite the industry's nominal emphasis on the need for further research, the CTR designed its research program to avoid studying the biological effects of tobacco use, the very question that, according to the industry's statements, required more research. To the extent that defendant conducted

research on that issue independently of the CTR, it did so in a European laboratory that it purchased, and it was careful to avoid preserving records of the results in this country. Defendant's director of research in the late 1970s and 1980s explained to a subordinate that his job was to attack outside research that was inconsistent with the industry's position by casting doubt on it. The jury could also have found that there was a "gentleman's agreement" not to conduct research beyond what the CTR did. The primary purpose of the CTR's research was to provide expert witnesses for congressional hearings and lawsuits, not to determine the relationship between smoking and disease. The CTR's lawyers, rather than its scientists, established its research priorities; developing accurate information on the biological effects of smoking was not one of the lawyers' priorities.

The jury could have found that, throughout this period of time, defendant and the other tobacco companies actually had little doubt that cigarette smoking was causally related to a number of diseases. In 1958, three British researchers found that the American tobacco scientists with whom they spoke believed that cigarette smoke could cause cancer. In 1961, defendant's director of research stated that cigarette smoke contained so many carcinogens that the best that the company could do was to reduce their amounts. Internal company memoranda agreed and suggested that it could not admit those facts publicly because of adverse legal consequences. At least by the 1970s, there was absolutely no scientific basis for denying the connection between cigarette smoking and cancer and other diseases. However, defendant continued to assert that the hazard of cigarette smoking to health was uncertain when it actually knew that there was no legitimate controversy about that subject.

The jury could also have found that defendant recognized both that nicotine was addictive and that its addictive effect was the primary reason that people continued to smoke. Defendant spent considerable effort discovering ways to deliver the optimal dose of nicotine in each cigarette without actually adding nicotine to its product. It also concluded that, because of nicotine's addictive effect, smoking cessation programs and technologies would be unlikely to work without significant behavioral therapy. In its view, providing

smokers a reason to believe that there were serious doubts that tobacco was harmful would discourage smokers from making the effort that was necessary to quit smoking.

Also, the jury could have found that defendant and the industry used a large number of methods to create the public impression of a legitimate controversy, despite the lack of supporting scientific evidence. They issued press releases, influenced the content of apparently neutral articles, cultivated opinion leaders, attempted to use their advertising power to get favorable treatment from the print media, and appeared on commercial and public television to put forth that message. Those individuals who spoke for defendant and the industry emphasized that the evidence concerning the dangers of smoking was primarily based on statistical relationships, and they argued that there was no proof that a specific component of tobacco smoke caused a specific disease. Even after the early 1990s, when the industry finally had to admit that tobacco could be a risk factor associated with a number of diseases, it argued that there was a long chain of intervening events before a disease actually arose from cigarette smoking. The industry, including defendant, also continued to deny that cigarette smoking was addictive and publicized that message throughout the country, including Oregon.

As a smoker, Williams was one of the intended recipients of the industry's message, and, in fact, the jury could have found that he received its message and relied on its representations. Those representations affected his decision to continue smoking and not to make greater efforts to overcome his addiction. When his family urged him to stop smoking, he responded that he had learned from watching television that smoking did not cause lung cancer. After his diagnosis, he blamed the "cigarette people" for betraying him—which, given his exclusive use of defendant's products, must at least have included defendant. The jury could have found on the evidence before it that, as a result of defendant's representations, Williams suffered his fatal lung cancer. The jury also could have found that Williams was one of thousands of Oregonians who received defendant's message, acted on it, and, like him, suffered cancer or other diseases as a result.

In our previous opinion, we described the requirements for proving a fraud claim in Oregon and explained why the jury could have found that plaintiff had proven fraud in this case. In short, the jury could have found that defendant, by itself and through the industry effort of which it was a part, intentionally made the false representation that there was a legitimate controversy about the health effects of cigarette smoking, that defendant knew that that representation was false, that Williams relied on it, that he thereafter continued to smoke, and that he suffered his fatal lung cancer as a result of that reliance. *Williams*, 182 Or App at 49-70. Based on the evidence, the jury awarded plaintiff compensatory damages of $21,485.80 in economic damages and $800,000 in noneconomic damages on that claim. In accordance with *former* ORS 18.560(1) (1999), *renumbered as* ORS 31.710(1) (2003), the trial court reduced the amount of noneconomic damages to $500,000 when it entered judgment.

In addition to compensatory damages, the jury awarded plaintiff punitive damages of $79.5 million, which the trial court reduced to $32 million. In our previous opinion, we reinstated the jury's verdict on those damages. The issue before us on remand is the extent to which that award of punitive damages is consistent with the Due Process Clause of the Fourteenth Amendment, particularly as the Court interpreted it in *State Farm*. In our previous opinion, we followed the Oregon Supreme Court's decision in *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 17 P3d 473 (2001), in deciding the federal constitutional issue. Now, on remand from the United States Supreme Court, we determine whether our earlier decision is consistent with the Supreme Court's discussion in *State Farm*. We begin that analysis by reviewing earlier United States Supreme Court cases on punitive damages, cases that provide the context for understanding the Court's decision in *State Farm*.

*Pacific Mutual Life Insurance Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991), is the first case in which the Court considered the effect of the Due Process Clause on the size of an award of punitive damages.[1] In

---

[1] The Court had previously rejected challenges to punitive damages under the Excessive Fines Clause of the Eighth Amendment. In several other cases, it had

*Haslip*, the defendant Ruffin, an agent and employee of the defendant insurance company, sold life insurance issued by the defendant company, together with health insurance issued by an unrelated company, to an Alabama municipality of which the plaintiffs were employees. Ruffin had the municipality send the premiums for the insurance to him at the company's branch office, rather than to the insurers directly, but he did not forward the premiums to either insurer. As a result of its failure to receive premiums, the health insurer sent notices that the insurance had lapsed for nonpayment to the plaintiffs, in care of Ruffin at the defendant company's branch office. Ruffin did not forward those notices to the plaintiffs. When the plaintiff Haslip sought medical services, she learned that she was uninsured and that she was personally liable for the charges that she had incurred. She was unable to pay her medical bills, and her physician placed her account with a collection agency. The agency obtained a judgment against her, adversely affecting her credit. *Haslip*, 499 US at 4-5.

The plaintiffs sued Ruffin and the defendant company for fraud. The jury returned general verdicts for damages for all plaintiffs. The verdict for Haslip was $1,040,000, which, the Court assumed, consisted of $200,000 in compensatory damages (the maximum amount that Haslip's attorney requested in his closing argument) and $840,000 in punitive damages. The Alabama Supreme Court affirmed the award, and the United States Supreme Court granted *certiorari. Haslip*, 499 US at 5-8. In its opinion, the Court first held that the Alabama common-law rule that made the company vicariously liable for punitive damages for its employee's fraud did not violate due process. *Id.* at 12-15. It then turned to the constitutionality of the award of punitive damages.

The Court began by concluding that the common-law method of assessing punitive damages—initially by a jury that is instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct, followed by

---

noted the possibility of a due process challenge but concluded that the issue was not properly raised. *See Haslip*, 499 US at 9-12.

trial and appellate court review—is consistent with due process. *Haslip*, 499 US at 15-18. It then evaluated whether the award to Haslip was constitutionally acceptable. It observed that, although it is not possible to draw a mathematical bright line between the constitutionally acceptable and the unacceptable, the reasonableness of the award and whether the jury received adequate guidance from the court are significant considerations. The trial court had expressly instructed the jury on the purposes of punitive damages—not to compensate but to punish and to deter future conduct. That instruction operated to limit the jury's discretion. In addition, under Alabama law, the jury did not receive evidence of the defendant's wealth, and the court told the jury that whether to award punitive damages at all was within its discretion. Thus, the jury's discretion in determining punitive damages was no greater than it would have been in many other areas of law. *Id.* at 18-20.

Alabama had also provided significant judicial review of the jury's award. Before *Haslip*, the Alabama Supreme Court had established procedures for a trial court to evaluate a jury award of punitive damages, including requiring the court to place the reasons for its decision in the record. In addition, Alabama provided appellate review of the criteria that it had previously established to ensure that punitive damage awards were reasonable in amount and rational in light of their purpose. *Haslip*, 499 US at 20-21. The Court concluded that those criteria imposed a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages. It especially noted that factfinders who are asked to award punitive damages must be guided by more than the defendant's net worth. The Court said, "Alabama plaintiffs do not enjoy a windfall because they have the good fortune to have a defendant with a deep pocket." *Id.* at 22.

After concluding that the defendant had received the full panoply of protections that Alabama provided, the Court mentioned that the award was more than four times the compensatory damages, more than 200 times Haslip's out-of-pocket expenses, and considerably in excess of a fine for insurance fraud. However, it concluded that, although "the monetary comparisons are wide and, indeed, may be close to

the line, the award here did not lack objective criteria." *Haslip*, 499 US at 23. The Court therefore affirmed the judgment for the plaintiff. *Id.* at 23-24.

The next case that the Court considered, *TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 113 S Ct 2711, 125 L Ed 2d 266 (1993) (*TXO*), arose out of a property dispute between two energy companies. TXO, the defendant, agreed to purchase rights to develop gas and oil on property where the plaintiff Alliance Resources controlled the major share of the rights. The agreement was subject to TXO's attorney determining that Alliance's title to the property was valid. In the process of making that determination, TXO discovered a 1958 deed that conveyed the coal mining rights on the property to another party. Although both the wording of the deed and interviews with the parties involved made it clear that the grantor had not conveyed oil and gas rights, TXO paid for a quitclaim deed from the owner of the coal rights and attempted to renegotiate its agreement with Alliance. It also unsuccessfully attempted to induce the grantor of the 1958 deed to execute a false affidavit to the effect that the deed included oil and gas rights. *Id.* at 447-49.

When its other efforts failed, TXO filed an action to quiet title based on the quitclaim deed, although it knew at the time that its action was frivolous. TXO's real reason for filing the action was to reduce its royalty payments under its agreement with Alliance. The trial court dismissed TXO's action based on the wording of the 1958 deed alone, holding that that deed made the quitclaim deed a nullity. On Alliance's counterclaim for slander of title, the jury awarded it $19,000 in actual damages—the cost of defending the quiet title action—and $10 million in punitive damages. There was evidence that TXO was a large company in its own right, that it was a wholly owned subsidiary of an even larger company, that the amount of royalties that it sought to renegotiate was substantial, and that it had engaged in similar nefarious activities in its business dealings in other parts of the county. *TXO*, 509 US at 449-51. The trial court refused to reduce the amount of punitive damages, and the West Virginia Supreme Court affirmed. *Id.* at 452.

On *certiorari*, the United States Supreme Court affirmed the judgment, with Justice Stevens writing the plurality opinion. Chief Justice Rehnquist and Justice Blackmun joined in full, and Justice Kennedy did so in part. Justice Kennedy also wrote a concurrence, as did Justice Scalia, with whom Justice Thomas joined. The remaining justices joined Justice O'Connor's dissent. The plurality first noted that, assuming that the lower courts followed fair procedures, a judgment that is a product of that process is entitled to a strong presumption of validity. It also noted that comparisons with other awards of punitive damages are difficult because no two cases are truly identical. *TXO,* 509 US at 456-57. It quoted the Court's statement in *Haslip* that it is not possible to draw a mathematical bright line between acceptable and unacceptable awards but that a general concern for reasonableness certainly enters into the calculation. *Id.* at 458.

In evaluating whether the award in *TXO* was grossly excessive, the plurality first rejected the defendant's emphasis on the fact that the award was 526 times the amount of the actual damages that the jury awarded. Although the plurality agreed that punitive damages should bear a reasonable relationship to compensatory damages, it agreed with a previous West Virginia Supreme Court case in which that court pointed out that the ratio between the dollar amounts of compensatory and punitive damages is only one of several factors for evaluating that relationship. Among the other factors that the West Virginia court identified was the relationship between the harm that was likely to occur from the defendant's conduct as well as the harm that actually occurred. *TXO*, 509 US at 459-60.

The jury could have found in *TXO* that the defendant would have avoided millions of dollars in royalty payments if it had successfully attacked the plaintiff's title. The plurality said that, even if the amount of savings were only $1 million, the award of punitive damages would not jar its sensibilities. *TXO*, 509 US at 461-62. It reasoned:

"The punitive damages award in this case is certainly large, but in light of the amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed in

> this case was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth, we are not persuaded that the award was so 'grossly excessive' as to be beyond the power of the State to allow."

*Id.* at 462 (footnote omitted). In its instructions to the jury, the trial court also authorized it to take into account the defendant's wealth in assessing punitive damages, recognizing that deterrence may require a larger fine for a defendant of larger means than it would for a defendant of ordinary means. The *TXO* plurality recognized that emphasizing the wealth of the wrongdoer increased the risk that the award would be influenced by prejudice against a large corporation, especially one from outside the state. However, it noted that in *Haslip* it had referred to the financial condition of the defendant as a factor in assessing punitive damages. *Id.* at 463-64.

In his concurrence, Justice Kennedy objected to the plurality's reliance on general reasonableness as the basis for evaluating the constitutionality of the award. He thought that it was more manageable to focus not on the amount of the award but on the jury's reasons for making the award:

> "The Constitution identifies no particular multiple of compensatory damages as an acceptable limit for punitive awards; it does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions. Rather, its fundamental guarantee is that the individual citizen may rest secure against arbitrary or irrational deprivations of property. When a punitive damages award reflects bias, passion, or prejudice on the part of the jury, rather than a rational concern for deterrence and retribution, the Constitution has been violated, no matter what the absolute or relative size of the award."

*TXO*, 509 US at 467 (Kennedy, J., concurring). He did not agree with the plurality that a rational relationship between the size of the award and the harm that the defendant's conduct threatened was an adequate basis for concluding that the award was rational because the record did not indicate that that was the basis on which the case was presented to the jury. He was concerned that the record suggested, as the

dissent argued, that the verdict was the result of redistributionist impulses arising from antipathy to a wealthy, out-of-state corporation. Justice Kennedy concluded, however, that the verdict was permissible, primarily because the defendant acted with malice; the evidence of "deliberate, wrongful conduct" was sufficient to show that the jury was motivated by a legitimate concern to punish and deter the defendant. *Id.* at 468-69 (Kennedy, J., concurring). Justice Kennedy observed:

"There was ample evidence of willful and malicious conduct by TXO in this case; the jury heard evidence concerning several prior lawsuits filed against TXO accusing it of similar misdeeds; and respondents' attorneys informed the jury of TXO's vast financial resources and argued that TXO would suffer only as a result of a large judgment."

*Id.* at 469 (Kennedy, J., concurring).

■    Justice Scalia, joined by Justice Thomas, concurred on the ground that due process required only that there be fair procedures for making and reviewing an award of punitive damages. Because the West Virginia courts properly instructed the jury and properly reviewed its verdict for reasonableness, he agreed that it should be affirmed.[2] *TXO*, 509 US at 470-72 (Scalia, J., concurring).

In her dissent, Justice O'Connor argued that the record showed that the verdict was based on prejudice against a wealthy outside corporation and constituted a windfall to the plaintiff based on the jury's desire to redistribute that wealth. *TXO*, 509 US at 490-91 (O'Connor, J., dissenting). She did not argue, however, that consideration of a defendant's wealth is impermissible. Rather, she said that courts simply need to recognize the special dangers involved when they review jury verdicts. *Id.* at 491-92 (O'Connor, J., dissenting).

---

[2] The Court subsequently followed Justice Scalia's suggestions concerning procedural requirements. In *Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994), it held that the Due Process Clause requires post-verdict review of punitive damage awards for excessiveness. In *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 US 424, 121 S Ct 1678, 149 L Ed 2d 674 (2001), it required appellate courts to determine whether an award of punitive damages is excessive without giving any deference to the trial court's decision on that issue. Our review of the award in this case is consistent with those procedural decisions.

*TXO* was followed by *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996) (*Gore*), a 5-4 decision. It became the first case in which the Court held that an award of punitive damages was excessive. In *Gore*, the jury awarded Gore, the plaintiff, $4,000 in actual damages and $4 million in punitive damages for BMW's conduct in representing that the car that it sold to him was new despite presale damage that required repainting the car at a cost of $601. BMW had a policy of not telling purchasers about presale repairs that cost less than three percent of the value of the vehicle. Gore produced evidence that the repair reduced the value of his car by $4,000, which was ten percent of its cost as new. He also produced evidence that between 1983 and the time of trial, the defendant had sold 983 cars, including 14 in Alabama, representing them to be new cars without disclosing that they had been repainted at a cost of more than $300 per vehicle. Gore calculated his request for punitive damages of $4 million by multiplying his $4,000 actual damages by the approximately 1,000 cars that the defendant had sold. *Gore*, 517 US at 563-65.

On appeal, the Alabama Supreme Court applied the criteria that the United States Supreme Court had approved in *Haslip* and held that the award was not excessive. However, the Alabama court concluded that the jury improperly included BMW's conduct in other jurisdictions in calculating the amount of punitive damages. It therefore reduced the amount of those damages to $2 million. The court based its conclusion on a belief that that amount was a constitutionally reasonable amount based on its comparative analysis both of other Alabama cases and of cases from other jurisdictions that involved a seller's misrepresentation of the condition of an automobile. *Gore*, 517 US at 566-67.

The United States Supreme Court first agreed with the Alabama court that the state had no authority to penalize a defendant for conduct in other jurisdictions that was legal where it occurred and that had no effect on Alabama residents. *Gore*, 517 US at 568-73. It did recognize, however, that evidence of out-of-state conduct may be relevant for determining the reprehensibility of a defendant's conduct. *Id.* at 574 n 21. The Court then concluded that the punitive damages award, even with the Alabama court's reductions, was

grossly excessive. The Court's focus in evaluating the award was on whether the defendant received fair notice, not only of the conduct that could subject it to punishment but also of the severity of the penalty. *Id.* at 574. It relied on three guide-posts for deciding that issue:

> "[T]he degree of reprehensibility of the nondisclosure; the disparity between the harm or potential harm suffered by Dr. Gore and his punitive damages award; and the differ-ence between this remedy and the civil penalties authorized or imposed in comparable cases."

*Id.* at 575.

■    According to the *Gore* Court, the reprehensibility of the defendant's conduct is the most important indication of the reasonableness of an award of punitive damages; some wrongs are more blameworthy than others. Trickery and deceit or repeated misconduct, for example, are more repre-hensible than mere negligence. *Gore*, 517 US at 575-76. In *Gore*, however, none of the factors associated with particu-larly reprehensible conduct was present. The harm that BMW inflicted was purely economic in nature. Although Gore argued that BMW's actions were part of a nationwide pattern of tortious conduct, the Court concluded that there was no reason for BMW to know that its actions violated applicable statutes or common-law rules in other states. In addition, there was no evidence that BMW had acted in bad faith when it predetermined the amount of repairs to a new car that, in its view, required disclosure before sale. Also, there was no evidence that it had made deliberate false state-ments, committed affirmative misconduct, or had concealed evidence of an improper motive. Thus, the Court concluded that no circumstances existed that are ordinarily associated with egregiously improper conduct. *Id.* at 576-80.

     Although it said that reprehensibility is the most important factor in assessing the reasonableness of an award, the Court commented that the second guidepost, the ratio between the award and the actual harm inflicted on the plaintiff, is probably the most often cited. It noted that early English statutes often provided for double, treble, or quad-ruple damages for particular wrongs and that, in *Haslip*, it had suggested that an award that was more than four times

the compensatory damages might be close to a constitutional violation. It then pointed out that the plurality in *TXO* had refined the issue by holding that the proper inquiry is the ratio between the punitive damages award and the harm likely to result from the defendant's conduct, not simply the harm that had occurred.[3] *Gore*, 517 US at 580-81.

In contrast to prior cases, the $2 million award in *Gore* was 500 times the amount of Gore's actual harm, and there was no indication that he was threatened with any additional potential harm. Assuming that the other 13 Alabama consumers suffered the same loss, the award was 35 times the total loss suffered by Alabama consumers. However, the Court rejected the idea that the constitutional line is marked by a simple mathematical formula, even one that compared actual and potential damages with the punitive award. For example, low awards of compensatory damages might support a higher ratio than high compensatory awards, particularly when a particularly egregious act resulted in relatively low economic damages or when injury is hard to detect or the monetary value of noneconomic harm is difficult to determine. *Gore*, 517 US at 582-83. Nevertheless, a ratio of 500 to 1 at least raised "a suspicious judicial eyebrow" for the Court. *Id.* at 583 (citation omitted).

The third guidepost for determining excessiveness involves comparing the award of punitive damages to the civil or criminal penalties that are available for the defendant's conduct. The purpose of that guidepost is to allow the reviewing court to give substantial deference to the legislative judgment about appropriate sanctions. The $2 million award in *Gore* was substantially greater than fines in Alabama or elsewhere for similar misconduct. None of those sanctions gave BMW notice that the first violation—or even the first 14 violations—could lead to a multimillion dollar penalty. There was also no reason to assume that a penalty of that size was necessary in order to motivate the defendant to change its policy, as it did after the verdict in this case. The Court assumed that the undisclosed damage and repainting affected the value of Gore's car and of the 13 other similar

---

[3] The Court treated that portion of the plurality opinion in *TXO* as stating the holding of the Court.

BMWs in Alabama and that those cars would lose their attractive appearance more rapidly than other BMWs, but it was not willing to accept the Alabama court's conclusion that BMW's conduct was sufficiently egregious to justify a punitive sanction that was equivalent to a severe criminal penalty. Moreover, the fact that BMW was a large corporation did not diminish its entitlement to fair notice of the demands that the several states imposed on it; indeed, its status implicated the federal interest in preventing undue burdens on interstate commerce. *Gore*, 517 US at 583-85.

Justice Breyer, along with two of the other justices who joined the majority opinion in *Gore*, concurred. He emphasized the need for proper standards for reviewing an award of punitive damages and concluded that the standards that the Alabama court had applied were so vague and open ended as to risk arbitrary results. In his view, those standards provided no basis for distinguishing between conduct that warrants a small award and conduct that would justify a very large award, and he thought that the Alabama courts had applied them in ways that did not in fact limit the amounts awarded. *Gore*, 517 US at 586-89 (Breyer, J., concurring). He also believed that BMW's financial status was offered into evidence simply to provide an open-ended basis for inflating an award against a wealthy defendant. Although the use of that factor was not unlawful or inappropriate *per se*, he said that it could not make up for the failure of other factors, such as reprehensibility, to constrain an award. *Id*. at 591 (Breyer, J., concurring). He faulted the Alabama courts for not applying any economic theory in evaluating the award and explained that the award, in his view, did not exemplify any community understanding or historic practice. *Id*. at 592-94 (Breyer, J., concurring). Because Alabama's legal standards offered virtually no constraint on jury awards, and because of the severe disproportion between the award and legitimate objectives for punitive damages, Justice Breyer agreed both with the Court's decision to scrutinize the award and with its conclusion that the award was grossly excessive and therefore unconstitutional. *Id*. at 596-97 (Breyer, J., concurring).

*Gore* provided the framework for our initial opinion in this case. Our opinion followed the Oregon Supreme

Court's holding in *Parrott*. In that case, the court applied the above-mentioned cases to a claim made under the Unlawful Trade Practices Act (UTPA), which expressly authorizes punitive damages for a violation of the statute. ORS 646.608(1)(e), (g), (t); ORS 646.638(1). The defendant, Carr Chevrolet, had been found to have knowingly misrepresented the status of the title and a number of other aspects of a vehicle that it had sold to the plaintiff. According to the evidence, those actions were part of Carr's normal business practices. The jury awarded the plaintiff compensatory damages of $11,496 and punitive damages of $1 million. The trial court reduced the punitive damages award to $50,000; on appeal, this court partially restored the award to $300,000. *Parrott v. Carr Chevrolet, Inc.*, 156 Or App 257, 965 P2d 440 (1998). The Oregon Supreme Court, after evaluating the *Gore* guideposts together with the "rational juror" criteria that the court had previously identified in *Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8 (1995), *cert den*, 517 US 1219 (1996), reinstated the jury's verdict in its entirety. It emphasized that, at least for the purposes of *Parrott*, both the *Gore* criteria and the rational juror standard were based entirely on federal law; at least before the adoption in 1995 of *former* ORS 18.537(2) (1995), *renumbered as* ORS 31.730(2) (2003),[4] there was no basis in Oregon law for challenging an award of punitive damages if there was any evidence to support an award. *See Parrott*, 331 Or at 551-65.

Applying its understanding of *Gore*, the Oregon Supreme Court identified in *Parrott* five criteria for determining the range of punitive damages that a rational juror would be entitled to award: (1) the statutory and common-law facts that allow an award for the claim at issue; (2) the state interests that the award would serve; (3) the degree of reprehensibility of the defendant's conduct; (4) the disparity between the award and the actual or potential harm inflicted; and (5) the civil and criminal sanctions provided for similar misconduct. The latter three criteria are the *Gore* guideposts. The second criterion also came from *Gore*, while the first criterion came from the court's previous discussion in *Oberg*.

---

[4] *Former* ORS 18.537 codified the "rational juror" standard that the Oregon court described in *Oberg*, making it part of state law. It became effective after the events at issue in *Parrott*.

*Parrott*, 331 Or at 555. After examining the facts in *Parrott*, the court stated that the case presented an extremely egregious violation of the UTPA. It held that punishing the defendant for misconduct in Oregon and deterring it from additional such conduct furthered a significant state interest. In its view, the defendant's misconduct was far more serious than that of the defendant in *Gore*, in part because it involved intentional affirmative misrepresentations of material facts and, in part, because the defendant's conduct was part of its ordinary business practices. *Id.* at 560-62.

The *Parrott* court then turned to the relationship between the actual or potential harm and the punitive damages award. It noted that analyzing that relationship required a consideration of the harm that was likely to result, as well as the harm that actually resulted. Because the defendant's conduct was a routine part of its business practices, the court considered the potential injury that those practices caused to past, present, and future customers. In that light, the 87-to-1 ratio between the punitive and compensatory damages did not raise any constitutional concerns. *Parrott*, 331 Or at 562-63. Finally, the court noted that the civil penalties for Carr's conduct could include injunctive relief and the loss of its business license. Those penalties could have potentially serious economic consequences for Carr. *Id.* at 563-64. For all of those reasons, the court reinstated the full amount of the punitive damages award. In turn, in light of *Parrott*, we reinstated the jury's award of punitive damages in this case. *Williams*, 182 Or App at 70-74. With that background, we turn to the Court's decision in *State Farm*, which was decided after the Oregon Supreme Court ruled in *Parrott* and which has prompted the remand of this case to us.

Curtis Campbell, one of the plaintiffs in *State Farm*, negligently caused an automobile accident that resulted in the death of another driver and the permanent disability of a third driver. The injured driver and the deceased driver's estate sued Campbell. State Farm Mutual Insurance Company (State Farm) was Campbell's liability insurer; its policy limits were $25,000 per claimant, for a total of $50,000. Although investigators and witnesses reached a consensus that Campbell's negligence was the cause of the accident,

State Farm decided to contest liability and refused offers from the injured parties to settle for the policy limits. Before trial, it assured Campbell and his wife that they had no reason to be concerned and that it would represent their interests. After the jury returned a verdict for $185,849, State Farm told them to put "for sale" signs on their house and refused to post a supersedeas bond in order for Campbell to appeal the judgment. Campbell managed to appeal on his own, and State Farm paid the judgment after the appellate court affirmed it. During the course of the appeal, Campbell and his wife reached an agreement with the injured parties under which the injured parties agreed not to seek satisfaction of their claims from the Campbells personally and under which the Campbells agreed to pursue a bad faith action against State Farm. *State Farm*, 538 US at 412-14.

The Campbells filed an action against State Farm. The trial court held a bifurcated trial. At the end of the first portion of the trial, the jury found that State Farm's decision not to settle was unreasonable because there was a substantial likelihood of an excess verdict. During the second part of the trial, the Campbells introduced evidence that State Farm's response to the claims against them was the result of a national program ("Performance, Planning and Review," or "PP&R") designed to cap payments on claims throughout the company. The evidence offered related to State Farm's business practices over a 20-year period in numerous states; most of it had no relationship to third-party insurance claims. State Farm countered with evidence that its decision to take the case to trial was simply an honest mistake. However, the jury awarded compensatory damages of $2.6 million and punitive damages of $145 million to the Campbells. The trial court reduced the awards to $1 million in compensatory damages and $25 million in punitive damages. On appeal, the Utah Supreme Court, applying the *Gore* guideposts, reinstated the original punitive damages award. In evaluating the reprehensibility of State Farm's conduct, it emphasized the evidence concerning the PP&R policy. The court also relied on State Farm's massive wealth and reasoned that, because of the clandestine nature of State Farm's conduct, the chance of punishment in any specific case was extremely small. *State Farm*, 538 US at 414-16.

In reviewing the Utah court's decision, the United States Supreme Court first restated its concerns about excessive punitive damages. It observed that the primary danger in such awards is their potential to deprive a person of property arbitrarily without fair notice and without furthering any legitimate purpose of punishment or deterrence. It stated that an award that is grossly excessive furthers no legitimate purpose and constitutes an arbitrary deprivation of property. The Court said that defendants subject to civil punitive damages do not have the same protections as defendants in a criminal case; among other things, jury instructions typically are vague and leave juries with broad discretion in choosing the amount to award, and evidence of a defendant's net worth creates the potential for bias against large businesses. Such concerns, according to the Court, increase when the decision-maker is presented with evidence that has little bearing on the amount that it should award. Based on those concerns, the Court proceeded to apply *Gore* guideposts to the case before it. *State Farm*, 538 US at 416-18.

With regard to the reprehensibility of State Farm's conduct, the Court summarized the factors that it had previously identified in *Gore* as whether

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*State Farm*, 538 US at 419 (citation omitted). The Court agreed that State Farm's conduct toward the Campbells did not merit any praise. In fact, State Farm employees had altered the company's records to make Campbell appear less culpable in the underlying accident, the company had disregarded the overwhelming likelihood both of liability and of a verdict in excess of the policy limits, and, although it had first assured the Campbells that their assets would be safe, after the verdict it had told them to sell their house. Thus, State Farm's conduct was reprehensible enough to support an award of punitive damages in some amount. *Id.* at 419-20.

The problem, however, in the case, according to the Court, was that the Campbells and the Utah courts had used State Farm's conduct in that case as a platform to expose and punish perceived deficiencies in State Farm's operations throughout the country concerning matters that had no relationship to its conduct in regard to the Campbells. In reinstating the jury's award, the Utah Supreme Court had emphasized evidence that the way that State Farm had treated the Campbells was simply one application of its nationwide PP&R policy. In doing so, according to the Court, the Utah court had improperly relied on evidence of dissimilar acts and of acts that were lawful in the states in which they occurred. The Court said that a state generally does not have a legitimate interest in punishing even unlawful acts committed outside of the state's jurisdiction. *State Farm*, 538 US at 420-22. It explained:

> "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."

*Id.* at 422 (citation omitted). That does not mean, the Court continued, that lawful out-of-state conduct is always irrelevant. Indeed, such "conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." *Id.*

In the Court's view, the Campbells demonstrated little evidence of repeated misconduct by State Farm of the kind that injured them. *State Farm*, 538 US at 423. The Court concluded that, "because the Campbells have shown no conduct by State Farm similar to that which harmed them," the only relevant conduct was State Farm's treatment of the Campbells themselves. *Id.* at 424. The limited evidence of State Farm's conduct that the jury could properly consider made that conduct far less reprehensible than the Utah court had believed it to be.

The Court turned next to the second *Gore* guidepost, the relationship between State Farm's conduct and the size of the award. It observed that the "precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* at 425. The Court did not reject the 145-to-1 ratio between the Campbells's compensatory damages and the award of punitive damages out of hand. Rather, it stated that the ratio gave rise to a presumption of constitutional invalidity and that the other considerations that it had identified did not overcome that presumption. It considered the fact that the Campbells had received $1 million as full compensation for a year and a half of emotional distress. Also, because State Farm paid the excess verdict before the Campbells filed their bad faith action, they had suffered only minor economic injuries. Their emotional harm thus arose from an economic transaction, not from a physical assault or trauma, and they had suffered no physical injuries. Moreover, in the Court's view, the compensatory and punitive damages partially overlapped because the compensatory damages included compensation for the emotional distress that State Farm had caused, a factor that the Court believed was also a basis for the punitive damage award. Although the Utah court had stated that State Farm's policies had affected many other Utah consumers, the Campbells were unable to point to evidence in the record demonstrating harm to anyone other than those involved in the case. Finally, the Court observed that State Farm's great wealth did not support an otherwise unconstitutional award, in part because the purpose of much of that wealth was to enable State Farm to pay the claims of its policyholders and in part because wealth by itself cannot make up for the failure to satisfy other guideposts, such as reprehensibility, to justify an award. *Id.* at 426-28.

With regard to the third *Gore* guidepost, the disparity between the punitive damages award and potentially applicable civil penalties, the Court modified its previous reliance on criminal penalties, suggesting that, although the existence of a criminal penalty bears on the seriousness with which the state views wrongful conduct, it is less useful in evaluating the amount of a punitive damages award. A state

can impose criminal penalties only after providing the protections that the criminal process entails; the remote possibility of a criminal sanction does not automatically sustain a punitive damages award. In any event, the only relevant Utah statutory penalty appeared to be a $10,000 fine for an act of fraud, an amount dwarfed by the punitive award of $145 million. The Court concluded that the evidence would sustain a punitive award only at or near the amount of compensatory damages, but it left the precise amount for the Utah courts to resolve in the first instance. *State Farm*, 538 US at 428-29.

We have previously applied *State Farm* to two cases involving punitive damages, each on remand from the United States Supreme Court. *Bocci v. Key Pharmaceuticals, Inc.*, 189 Or App 349, 76 P3d 669, *modified on recons*, 190 Or App 407, 79 P3d 908 (2003); *Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 78 P3d 570 (2003). In *Bocci*, the plaintiff Bocci took a prescription drug for asthma that the defendant Key Pharmaceuticals (Key) promoted as a safe product. He then took an antibiotic for a skin rash without telling the prescribing physician about his consumption of the asthma drug. When he began experiencing what proved to be toxicity from the asthma drug, he saw Edwards, a physician, for diagnosis and treatment. Because Key had promoted the asthma drug as safe, Edwards did not recognize Bocci's symptoms as toxicity to that drug. As a result, Edwards simply sent Bocci home; soon afterwards Bocci began experiencing seizures and ultimately suffered serious permanent injuries. He sued both Key and Edwards, and Edwards filed a cross-claim against Key. The jury awarded Bocci significant compensatory and punitive damages and awarded Edwards compensatory damages of $500,000 and punitive damages of $22.5 million. The jury expressly found that Key was negligent with respect to Edwards, that it had made fraudulent misrepresentations to him, that it had knowingly withheld or misrepresented information concerning the drug's toxicity to the Food and Drug Administration or prescribing physicians, and that it had acted with wanton disregard for the safety of others. 189 Or App at 352-53.

When we first considered the award of punitive damages in *Bocci*, before the decision in *State Farm*, we applied *Parrott* and affirmed the award. *Bocci v. Key*

*Pharmaceuticals, Inc.,* 178 Or App 42, 35 P3d 1106 (2001). On remand from the Court after its decision in *State Farm,* we reevaluated the jury's award in light of the *Gore* guideposts as the Court had refined them in that case. We began with the first guidepost, the reprehensibility of Key's conduct, and considered the various factors that the Court had identified in *State Farm.* We rejected Key's argument that we should ignore evidence that did not directly relate to Edwards's claim. Unlike in *State Farm,* where the evidence of other harm involved dissimilar acts that bore no relation to the harm that the Campbells suffered, Key's actions toward Bocci were the same acts that caused harm to Edwards. In addition, we rejected Key's argument that we should ignore the evidence of its out-of-state promotional activities. Although the Court in *State Farm* had rejected the Campbells' evidence of State Farm's unrelated misconduct, it also had recognized the relevance of repeated out-of-state misconduct of the same sort that injured the plaintiff. We concluded that it was appropriate for the jury to consider evidence that Key had engaged in a nationwide dissemination of false and misleading information and that that conduct had led to Bocci's and Edwards's damages. *Bocci,* 189 Or App at 356-58.

The harm that resulted from Key's conduct was physical and economic harm to Bocci as well, and Key's actions demonstrated an indifference to or reckless disregard of the health and safety of others. Neither party addressed the factor of the victim's financial vulnerability, but it was clear that Key's actions were repeated as opposed to isolated incidents of misconduct. In addition, Key knowingly withheld or misrepresented information concerning the toxicity and safety of the drug. Thus, there was evidence of four of the five factors for determining reprehensibility that the Court had applied in *State Farm. Bocci,* 189 Or App at 358-59.

We next discussed the relationship between the harm or potential harm to the plaintiff and the punitive damages award. We recognized that the Court had suggested that the ratio between compensatory and punitive damages should ordinarily be in single digits and that a ratio greater than 4 to 1 might be questionable. The ratio of the punitive damage award to the award of compensatory damages in

*Bocci* exceeded single digits, which raised questions about the award. Although we held that Key's conduct did not rise to the level of " 'particularly egregious,' intentionally malicious acts that would justify a ratio in excess of single digits," it was sufficiently malicious that it justified a ratio greater than 4 to 1. *Bocci*, 189 Or App at 359-61. We ultimately concluded that a ratio of 7 to 1, or an award of $3.5 million, was constitutionally permissible.[5]

*Waddill* was a personal injury case in which the plaintiff was severely injured when a glass fishbowl shattered while she was carrying it filled with water. Although Anchor Hocking, the defendant manufacturer, had learned of similar incidents, it had not retained records of them and had failed to use those incidents to improve the safety of its product. It had not even added a simple warning of the dangers of carrying a fish bowl with water in it. The jury awarded Waddill compensatory damages of $132,472 (which the court reduced to $100,854 to reflect the jury's finding that the plaintiff was 25 percent at fault) and punitive damages of $1 million. *Waddill*, 190 Or App at 178-79. We originally affirmed, *Waddill v. Anchor Hocking, Inc.*, 175 Or App 294, 27 P3d 1092 (2001), *rev den*, 334 Or 260 (2002), but the Court vacated our decision and remanded for reconsideration in light of *State Farm*.

On remand, we concluded that Anchor Hocking was indifferent to or recklessly disregarded the health and safety of its customers. However, the evidence of repeated conduct was weak, and there was no evidence that Anchor Hocking had acted with intentional malice or had engaged in fraudulent conduct or deceit. We concluded that Anchor Hocking's actions were sufficiently egregious to justify an award of punitive damages, but they were not as egregious as those of the defendant in *Bocci*. Because the Court indicated in *State Farm* that a ratio of 4 to 1 was close to the constitutional ceiling, and because there was nothing unusual about the facts of *Waddill*, we concluded that the maximum permissible award in *Waddill* was four times the harm that Anchor

---

[5] There was no relevant evidence on the third guidepost, the relationship between the award and any civil penalties authorized in similar cases. *Bocci*, 189 Or App at 361.

Hocking caused and reduced the punitive damages award accordingly. *Waddill*, 190 Or App at 182-83.

We turn now to the parties' argument in this case after remand by the Court. Defendant first argues that it is now clear, as a result of the Court's discussion in *State Farm*, that we erred in our previous decision when we rejected its assignment of error concerning the trial court's failure to instruct the jury that, among other things,

> "[t]he size of any punishment should bear a reasonable relationship to the harm caused to Jesse Williams by the defendant's punishable misconduct. Although you may consider the extent of harm suffered by others in determining what that reasonable relationship is, you are not to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own in which other juries can resolve their claims and award punitive damages for those harms, as such other juries see fit."

(Internal quotations omitted.) Defendant states that the instruction "perfectly predicted the Supreme Court's holdings in *State Farm*." In support of its argument, it quotes the Court's statements that

> "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis"

and that punishment on the basis of harm to nonparties

> "creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains."

538 US at 423.

We briefly considered this aspect of *State Farm* in *Bocci*, in which Key argued, based on the first statement that defendant quotes, that we should not consider the harm to Bocci in evaluating the punitive damages awarded to Edwards. In response, we noted that the Court had made that statement in the context of discussing the Utah Supreme Court's reliance on what the Court described as State Farm's dissimilar acts, which, according to the Court,

bore no relationship to the harm that the Campbells suffered. In *Bocci*, in contrast, there was nothing hypothetical about Bocci's claim or about the harm that Key caused him; the harm to Edwards was the result of the same acts that had caused harm to Bocci. We therefore rejected that argument in that case. *Bocci*, 189 Or App at 357-58.

In this case, there is evidence concerning other Oregon victims of defendant's decades-long fraudulent scheme. The tobacco industry and defendant directed the same conduct toward thousands of smokers in Oregon. They all received the same representations, from the same entities, and through the same media, and the industry intended to induce Oregon smokers to act on those representations in the same way. That conduct was a fundamental part of defendant's business strategy; Williams was simply one of its many Oregon victims. In that sense, this case is more like *Gore* than like *State Farm*. In *Gore*, there was evidence of BMW's identical misconduct toward 13 other people in Alabama that the Court considered relevant. Under the facts of this case, the evidence of injury to others is not an attempt to blacken defendant's reputation in general, but, rather, it describes the consequences to other Oregonians resulting from the very actions that harmed plaintiff. Thus, we are not persuaded by defendant's argument that we erred in our previous decision when we rejected its argument that the trial court erred by failing to instruct the jury that it could not punish defendant for the impact of its misconduct on others.

In addition, as we noted in our original opinion, ORS 30.925(2)(g) requires a jury to consider evidence of punishments already imposed on the defendant when it considers the amount of an award of punitive damages. As a result, the Court's concern in *State Farm* about multiple punitive damages awards that would be excessive in total is ameliorated by Oregon law. By introducing evidence of this award in future cases, defendant can ensure that both juries and courts will adjust any future award to account for this one. Contrary to the usual situations on which the Court based its statement, the judgment in this case will protect defendant from an excessive judgment in a future case, even if it may not be legally binding on future parties. For both of those reasons, we believe that the holding in *State Farm* does not

affect our previous conclusion that "the potential injury to past, present, and future consumers as the result of a routine business practice is an appropriate consideration in determining the amount of punitive damages." *Williams*, 182 Or App at 64.[6]

■ We now turn to the primary issue before us, whether the jury's award is consistent with the *Gore* guideposts as the Court refined them in *State Farm*. As an initial matter, in general, the State of Oregon has a legitimate interest in punishing defendant and deterring it from further misconduct. *See Gore*, 517 US at 568-69 (discussing the state's interest regarding punitive damage awards).[7] In *Gore*, those interests were limited by, among other things, the nature of the harm (economic) and the diversity of state approaches to dealing with deceptive trade practices. In this case, the state's interests are at their maximum; they involve the protection of the health and lives of its citizens. *See Williams*, 182 Or App at 68-69. Defendant does not suggest that there is any diversity among states concerning the importance of that kind of interest.

The first *Gore* guidepost concerns the reprehensibility of defendant's conduct. In our view, this case involves conduct that is more reprehensible than that in any of the cases that we have discussed. As we have said, the jury could have found the following facts from the evidence before it. Defendant sold a product that it knew would cause death or serious injury to its customers when they used it as defendant intended them to use it. Despite that knowledge, defendant, together with the rest of the tobacco industry, engaged in an extensive campaign to convince smokers that the issue of cigarette safety was unresolved. It insisted that more research was necessary at the very time that it was carefully avoiding doing the very research for which it called, although it had an extensive program of research into other issues. Rather, it

---

[6] As plaintiff points out, defendant's proposed instruction is also confusing, and the trial court could properly have refused to give it for that reason. The instruction would have informed the jury both that it *may* consider the harm to others in determining the reasonable relationship of its award to the harm caused to Williams and that it *may not* punish defendant for the impact of its misconduct on others.

[7] *See also* ORS 31.735 (providing for the distribution of punitive damages between prevailing parties and the State of Oregon).

used its research to determine the optimum dose of nicotine in each cigarette, knowing of, but publicly denying, nicotine's highly addictive properties. Defendant also knew that, because of those addictive properties, it would be difficult for smokers to quit smoking, and it relied on its fraudulent message to discourage them from doing so. The result, as defendant hoped, was that addicted smokers remained addicted and purchased more of its product. In short, defendant used fraudulent means to continue a highly profitable business knowing that, as a result, it would cause death and injury to large numbers of Oregonians.

We held in *Bocci* that Key's conduct of disseminating false and misleading information about its drug throughout the nation was especially reprehensible and justified a greater award. Key's drug was, however, potentially useful in the treatment of a serious disease, and there was no evidence that Key routinely engaged in that misconduct with regard to its products. In comparison, defendant's actions in this case are far more egregious than Key's actions in *Bocci*, considering the length of time over which the conduct occurred, the number of business entities involved, the express intention to mislead consumers, the number of people harmed, and in almost every other aspect of what defendant did. That difference in magnitude of harm places this case in a different class from the cases that we have described. Here, the harm caused was physical rather than economic and, for Williams, the most serious physical harm possible, his death. Defendant's conduct not only shows a reckless disregard of the safety of others but conduct with knowledge that others would be harmed by its actions. Moreover, defendant's fraud was motivated by economic considerations. In other words, the jury could have found that defendant misrepresented the safety of its product for its own pecuniary gain, gain that it would not otherwise have achieved but for the misrepresentation. There is no evidence concerning the third factor, whether Williams was financially vulnerable. The fourth factor is whether the conduct involved repeated actions or was simply an isolated incident. Not only did defendant's conduct involve repeated actions, those actions were directed at Oregon citizens over a period of 40 years. The fifth factor is

whether the harm was the result of intentional malice, trickery, or deceit or simply an accident. Here, defendant intentionally misled the Oregon public regarding the results of its research and increased the nicotine in its products to make them more addictive and more dangerous. Thus, in our view, four of the five *Gore* factors exist in this case.[8]

■　　　The second *Gore* guidepost is "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award[.]" *State Farm*, 538 US at 418. For purposes of guidance, we quote extensively from the Court's opinion in *State Farm*:

> "Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. 517 U.S., at 582 ('[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award'); *TXO, supra*, at 458. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U.S., at 23-24. We cited that 4-to-1 ratio again in *Gore*. 517 U.S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.*, at 581, and n 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the

_____

[8] Defendant argues that Oregon cannot punish it for conduct that was lawful where it occurred or for selling a lawful product. First, all of the out-of-state conduct that we discuss led to actions within Oregon or that were directed to Oregonians; Oregon has the authority to punish defendant for such conduct. Second, the punitive damages award was based not simply on defendant's selling cigarettes but on its using fraudulent and deceptive means in order to do so.

State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.*, at 582, or, in this case, of 145 to 1.

"Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' *Ibid.*; see also *ibid.* (positing that a higher ratio *might* be necessary where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine'). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

"In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."

*Id.* at 424-26 (emphasis and brackets in original).

There is no doubt that, under the holding in *State Farm*, there is a presumption of constitutional invalidity arising from the jury's award of punitive damages in this case, if there is, in fact, a 96-to-1 ratio between the compensatory and punitive damages awarded to plaintiff. We are mindful that the Court said in *State Farm* that "few awards exceeding a single-digit ratio * * * will satisfy due process" and that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm*, 538 US at 425 (citation omitted). We first inquire therefore as to what is the correct amount of compensatory damages to consider for purposes of computing the ratio under the second guidepost in *Gore*. In answering that question, we are guided by the Court's decisions in *TXO* and *Gore*.

In *TXO*, the plurality writing for the Court took into consideration the respondents' actual damages and the

potential damage that could have been caused by its conduct, had TXO's fraudulent scheme succeeded:

"It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred."

509 US at 460 (emphasis in original). The Court calculated the potential harm of TXO's conduct to be more than 50 times the $19,000 in actual damages that the respondents suffered. *Id.* at 459-62 (plurality opinion). In *Gore*, the plaintiff introduced evidence that BMW had sold 14 cars in the State of Alabama without disclosing that the cars had been repainted. The Court recognized that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 US at 568. Court explained that, to avoid encroachment on policy choices of other states, the economic penalties that a state inflicts must be supported by the state's interest in protecting its own consumers. Thus, the Court analyzed the reasonableness of the award of punitive damages in *Gore* based on the interests of Alabama consumers rather than those of the entire nation. *Id.* at 572-73.

We apply those principles to the facts in this case. First, there is the harm to Williams found by the jury to amount to $21,485 in economic damages and $800,000 in noneconomic damages. Second, defendant inflicted potential harm on the members of the public in Oregon through its fraudulent promotional scheme. As we said in our previous opinion,

"The jury could find on this record that defendant's public relations campaign had precisely the effect that defendant intended it to have and that it affected large numbers of tobacco consumers in Oregon other than Williams. It is also reasonably inferable from the evidence that defendant's products, used as defendant intended them to be used, caused a significant number of deaths each year in Oregon during the pertinent time period, together with other serious but nonfatal health problems with their attendant economic consequences."

*Williams*, 182 Or App at 67. As the Court did in *TXO*, the jury in assessing the amount of punitive damages was entitled to draw reasonable inferences as to the number of smokers in Oregon who had been defrauded during the past decades and would be affected in the future by defendant's conduct, if that conduct were not deterred. Based on the evidence before it, and, particularly, the pervasiveness of defendant's advertising scheme in Oregon, it would have been reasonable for the jury to infer that at least 100 members of the Oregon public had been misled by defendant's advertising scheme over a 40-year period in the same way that Williams had been misled. Such a conservative calculation of compensatory damages based on William's actual damages and the potential magnitude of damage to the public thus would cause the ratio between compensatory and punitive damages, whatever it is, to fall within *State Farm*'s 4-to-1 boundary.

But even if the $79 million award is deemed to exceed a single-digit ratio, it is difficult to conceive of more reprehensible misconduct for a longer duration of time on the part of a supplier of consumer products to the Oregon public than what occurred in this case. We think that the reprehensibility of defendant's conduct far exceeds that of *TXO* where the Court upheld a 10-to-1 ratio, or in *Bocci*, where we upheld a 7-to-1 ratio. Here, in contrast to those cases, the number of potentially defrauded and injured victims is much greater. As the *State Farm* Court stated in the above-quoted language, there are no bright-line ratios or rigid benchmarks that a punitive damage award cannot exceed. We think the unique facts in this case, when compared to the circumstances considered by the Supreme Court and this court in other cases, would justify more than a single-digit award under the Due Process Clause.

The final *Gore* guidepost examines any disparity between the punitive damages award and other penalties that the state provides for the same conduct. In our previous opinion, we noted that Oregon does not provide civil sanctions for defendant's conduct and that the criminal statutes that plaintiff mentioned were not truly comparable. *Williams*, 182 Or App at 72. Thus, this guidepost does not play a significant role in our analysis, and to the extent that

the purpose of the guidepost is to give defendants notice that they may be held liable for punitive damages, ORS 30.925(2) fulfills that function.

Finally, we consider the subject of defendant's wealth and the profitability of its conduct. Although the Court in *State Farm* was concerned that the use of the factor of a defendant's wealth could lead a jury to act to redistribute wealth from a wealthy corporation to an impoverished plaintiff, the wealth of a defendant continues to be an appropriate consideration. *State Farm*, 538 US at 427-28. In this case, the evidence was that, at the time of trial, defendant's net worth was over $17 billion and defendant's profit for the most recent year for which figures were available was $1.6 billion. *Williams*, 182 Or App at 67. That evidence could be properly considered by the jury in two ways. First, the jury could have found that a large award was necessary in order to punish defendant adequately because it would treat a small award as no more than an insignificant nuisance and part of the cost of doing business. Second, the jury could have found on the evidence before it that a large award would require defendant to disgorge some of the profit that it gained over a number of decades by its misconduct directed at decedent and other Oregonians. In that light, the evidence of defendant's wealth and profits both supports the award of punitive damages and provides a proper basis for consideration by the jury.

Based on the above analysis, we conclude that an award of punitive damages in the amount of $79.5 million does not violate the Due Process Clause under the guidelines provided by *State Farm* because the amount of the award is reasonable and proportionate to the wrong inflicted on decedent and the public of this state. It follows, that, after reconsidering our previous opinion in light of *State Farm*, we believe that our original decision was correct. We therefore again reinstate the award of punitive damages as originally found by the jury.

On appeal, reversed and remanded with instructions to enter judgment on jury verdict; affirmed on cross-appeal.