Argued and submitted May 10, 2005, decision of Court of Appeals affirmed;
judgment of circuit court reversed, and case remanded to circuit court for
further proceedings February 2, 2006

Mayola WILLIAMS,
Personal Representative of the Estate of
Jesse D. Williams, Deceased,
*Respondent on Review,*

*v.*

PHILIP MORRIS INCORPORATED,
nka Philip Morris USA Inc.,
*Petitioner on Review,*

*and*

RJ REYNOLDS TOBACCO COMPANY,
Fred Meyer, Inc.,
and Philip Morris Companies, Inc.,
*Defendants.*

(CC 9705-03957; CA A106791; SC S51805)

127 P3d 1165

William F. Gary, of Harrang Long Gary Rudnick P.C., Eugene, argued the cause and filed the briefs for petitioner on review. With him on the briefs were Sharon A. Rudnick and James E. Mountain, Jr.

James S. Coon, of Swanson, Thomas & Coon, Portland, argued the cause and filed the briefs for respondent on review. With him on the surreply brief were Raymond F. Thomas, Portland, Robert S. Peck, of Center for Constitutional Litigation PC, *pro hac vice*, Washington, D.C., William A. Gaylord, of Gaylord Eyerman Bradley PC, Portland, Charles S. Tauman, Portland, Kathryn H. Clarke, Portland, and Maureen Leonard, Portland.

Thomas W. Brown, of Cosgrave Vergeer Kester LLP, Portland, filed the briefs for *amicus curiae* Associated Oregon Industries.

Thomas W. Sondag, of Lane Powell PC, Portland, filed the brief for *amicus curiae* Chamber of Commerce of the United States of America.

Steven C. Berman, of Stoll Stoll Berne Lokting & Shlachter P.C., Portland, filed the brief for *amici curiae* Alliance for Lung Cancer Advocacy, Support and Education; American Cancer Society (Greatwest Division); American Heart Association; American Lung Association of Oregon; and Tobacco Free Coalition of Oregon.

David F. Sugerman, of Paul & Sugerman, PC, Portland, filed the brief for *amici curiae* Oregon Trial Lawyers Association and Oregon Consumer League.

Charles F. Adams and James A. Zehren, of Stoel Rives LLP, Portland, filed the brief for *amicus curiae* Oregon Business Association.

Before Carson, Chief Justice,** and Gillette, Durham, Riggs, and De Muniz,*** Justices.****

---

** Chief Justice when case was argued.

*** Chief Justice when decision was rendered.

**** Balmer and Kistler, JJ., did not participate in the consideration or decision of this case.

GILLETTE, J.

**GILLETTE, J.**

This tort case arose out of the death of Jesse Williams, a smoker, who died of lung cancer. Plaintiff Mayola Williams is the widow of Jesse Williams and personal representative of his estate. Plaintiff sued defendant Philip Morris Inc. for, *inter alia*, negligence and fraud, asserting a causal connection between Jesse Williams's smoking habit and his death. A jury found for plaintiff on both causes of action. The jury awarded both economic and noneconomic damages; it also awarded plaintiff punitive damages of $79.5 million. The issue before us is whether that punitive damage award violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court of Appeals concluded that it did not. *Williams v. Philip Morris Inc.*, 182 Or App 44, 48 P3d 824 (2002) (*Williams I*), *adh'd to on recons*, 183 Or App 192, 51 P3d 670, *rev den*, 335 Or 142, 61 P3d 938 (2002), *vac'd and rem'd*, 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003), *on remand*, 193 Or App 527, 92 P3d 126 (2004) (*Williams II*). For the reasons that follow, we agree.

## I.  FACTS

Because the jury ruled in favor of plaintiff, we state all facts in the light most favorable to plaintiff. *See Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 556, 17 P3d 473 (2001) ("[W]hen reviewing a punitive damages award for excessiveness, the reviewing court must view the facts in the light most favorable to the jury's verdict if there is evidence in the record to support them."). Because the parties do not dispute the way that the Court of Appeals framed the facts, we quote extensively from that court's opinions.

Jesse Williams was a lifelong smoker who eventually died of lung cancer. The cancer was caused by Williams's smoking.

"From the early 1950s until his death from a smoking-related lung cancer in 1997, Williams smoked [Philip Morris]'s cigarettes, primarily its Marlboro brand, eventually developing a habit of three packs a day. At that point, he spent half his waking hours smoking and was highly addicted to tobacco, both physiologically and psychologically. Although, at the urging of his wife and children, he

made several attempts to stop smoking, each time he failed, in part because of his addiction. Despite the increasing amount of information that linked smoking to health problems during that 40-year period, Williams resisted accepting or attempting to act on it. When his family told him that cigarettes were dangerous to his health, he replied that the cigarette companies would not sell them if they were as dangerous as his family claimed. When one of his sons tried to get him to read articles about the dangers of smoking, he responded by finding published assertions that cigarette smoking was not dangerous. However, when Williams learned that he had inoperable lung cancer he felt betrayed, stating 'those darn cigarette people finally did it. They were lying all the time.' He died about six months after his diagnosis."

*Williams II*, 193 Or App at 530-31.

Plaintiff based her fraud claim against Philip Morris on a 40-year publicity campaign by Philip Morris and the tobacco industry to undercut published concerns about the dangers of smoking. *Id.* at 531. Philip Morris and the tobacco industry had known for most of those 40 years, if not all of them, that smoking was dangerous. *Id.* Nevertheless, they tried to create in the public mind the impression that there were legitimate reasons to doubt the danger of smoking. *Id.* Philip Morris and the tobacco industry did so to give smokers a reason to keep smoking (or, perhaps more accurately, to undermine one of the main incentives for smokers to stop smoking). *Id.*

The Court of Appeals summarized the evidence regarding the campaign as follows:

"The industry established its strategy and began developing its public image in response to a decline in cigarette sales in 1953 that was the apparent result of studies that showed that cigarette tar could cause cancer in mice and that established the existence of statistical correlations between smoking and lung cancer. The first public joint effort by the industry occurred in January 1954, when [Philip Morris] and other tobacco companies published a joint statement in 448 newspapers throughout the country. In that statement, among other things, they announced the creation of the Tobacco Industry Research Committee (TIRC), one of whose stated goals was to conduct research

into 'all phases of tobacco use and health.' In 1964, the year of the Surgeon General's report on the hazard of smoking to health, the industry divided the TIRC into two parts, one of which, the Council on Tobacco Research (CTR), continued to support scientific research. The other part, named the Tobacco Institute, focused on public relations and lobbying.

"Between 1954 and the 1990s, those organizations developed and promoted an extensive campaign to counter the effects of negative scientific information on cigarette sales. The individual tobacco companies, including [Philip Morris], were part of the organizations and acted in cooperation with them. At first, the industry publicly denied that there was a problem; for example, in the 1950s and early 1960s, [Philip Morris]'s officials told the public that [Philip Morris] would 'stop business tomorrow' if it believed that its products were harmful. For most of that period, however, the industry did not attempt to refute the scientific information directly; rather, it tried to find ways to create doubts about it. The industry's goal was to create the impression that scientists disagreed about whether cigarette smoking was dangerous, that the industry was vigorously conducting research into the issue, and that a definitive answer would not be possible until that research was complete. As one of [Philip Morris]'s vice-presidents explained in an internal memo, the purpose was to give smokers a psychological crutch and a self-rationale that would encourage them to continue smoking. A Tobacco Institute internal memorandum similarly described the industry's purpose to provide smokers 'ready-made credible alternatives' to the evidence of the dangers of smoking.

"Both the industry as a whole and [Philip Morris] acted consistently with those purposes. Among other things, they avoided developing contradictory information. Despite the industry's nominal emphasis on the need for further research, the CTR designed its research program to avoid studying the biological effects of tobacco use, the very question that, according to the industry's statements, required more research. To the extent that [Philip Morris] conducted research on that issue independently of the CTR, it did so in a European laboratory that it purchased, and it was careful to avoid preserving records of the results in this country. [Philip Morris]'s director of research in the late 1970s and 1980s explained to a subordinate that his job was to attack outside research that was inconsistent with the industry's

position by casting doubt on it. The jury could also have found that there was a 'gentleman's agreement' not to conduct research beyond what the CTR did. The primary purpose of the CTR's research was to provide expert witnesses for congressional hearings and lawsuits, not to determine the relationship between smoking and disease. The CTR's lawyers, rather than its scientists, established its research priorities; developing accurate information on the biological effects of smoking was not one of the lawyers' priorities.

"The jury could have found that, throughout this period of time, [Philip Morris] and the other tobacco companies actually had little doubt that cigarette smoking was causally related to a number of diseases. In 1958, three British researchers found that the American tobacco scientists with whom they spoke believed that cigarette smoke could cause cancer. In 1961, [Philip Morris]'s director of research stated that cigarette smoke contained so many carcinogens that the best that the company could do was to reduce their amounts. Internal company memoranda agreed and suggested that it could not admit those facts publicly because of adverse legal consequences. At least by the 1970s, there was absolutely no scientific basis for denying the connection between cigarette smoking and cancer and other diseases. However, [Philip Morris] continued to assert that the hazard of cigarette smoking to health was uncertain when it actually knew that there was no legitimate controversy about that subject.

"The jury could also have found that [Philip Morris] recognized both that nicotine was addictive and that its addictive effect was the primary reason that people continued to smoke. [Philip Morris] spent considerable effort discovering ways to deliver the optimal dose of nicotine in each cigarette without actually adding nicotine to its product. It also concluded that, because of nicotine's addictive effect, smoking cessation programs and technologies would be unlikely to work without significant behavioral therapy. In its view, providing smokers a reason to believe that there were serious doubts that tobacco was harmful would discourage smokers from making the effort that was necessary to quit smoking.

"Also, the jury could have found that [Philip Morris] and the industry used a large number of methods to create the public impression of a legitimate controversy, despite the lack of supporting scientific evidence. They issued press

releases, influenced the content of apparently neutral articles, cultivated opinion leaders, attempted to use their advertising power to get favorable treatment from the print media, and appeared on commercial and public television to put forth that message. Those individuals who spoke for [Philip Morris] and the industry emphasized that the evidence concerning the dangers of smoking was primarily based on statistical relationships, and they argued that there was no proof that a specific component of tobacco smoke caused a specific disease. Even after the early 1990s, when the industry finally had to admit that tobacco could be a risk factor associated with a number of diseases, it argued that there was a long chain of intervening events before a disease actually arose from cigarette smoking. The industry, including [Philip Morris], also continued to deny that cigarette smoking was addictive and publicized that message throughout the country, including Oregon."

*Id.* at 531-34.

Philip Morris and the tobacco industry intended to deceive smokers like Williams, and it did in fact deceive him.

"As a smoker, Williams was one of the intended recipients of the industry's message, and, in fact, the jury could have found that he received its message and relied on its representations. [The jury further could have found that t]hose representations affected his decision to continue smoking and not to make greater efforts to overcome his addiction. When his family urged him to stop smoking, he responded that he had learned from watching television that smoking did not cause lung cancer. After his diagnosis, he blamed the 'cigarette people' for betraying him — which, given his exclusive use of [Philip Morris]'s products, must at least have included [Philip Morris]. The jury could have found on the evidence before it that, as a result of [Philip Morris]'s representations, Williams suffered his fatal lung cancer. The jury also could have found that Williams was one of thousands of Oregonians who received [Philip Morris]'s message, acted on it, and, like him, suffered cancer or other diseases as a result."

*Id.* at 534.

Furthermore, Philip Morris also deceived other smokers in Oregon:

"Although a tobacco industry survey indicated that 85 percent of smokers wished that they had never started smoking, [Philip Morris] concealed information that the addictive effects of nicotine made it difficult for them to stop without significant assistance. The fraudulent statements from [Philip Morris] and the rest of the industry reinforced those addictive effects by giving smokers a reason not to make the necessary effort to break the addiction. The jury could [have found] on this record that [Philip Morris]'s public relations campaign had precisely the effect that [Philip Morris] intended it to have and that it affected large numbers of tobacco consumers in Oregon other than Williams. It is also reasonably inferable from the evidence that [Philip Morris]'s products, used as [Philip Morris] intended them to be used, caused a significant number of deaths each year in Oregon during the pertinent time period, together with other serious but nonfatal health problems with their attendant economic consequences."

*Williams I*, 182 Or App at 66-67.[1]

---

[1] These last statements reflect the one real disagreement between the parties over the record. Philip Morris claims repeatedly that the record does not show that its fraud injured any party other than Williams. However, its opening brief indicates that Philip Morris does not contest how the Court of Appeals summarized the record. Rather, it argues that plaintiff did not put on any *specific* evidence to show that any *particular* person (other than Williams) continued smoking because of the fraud.

> "There is nothing in the record that supports the Court of Appeals' assumption that any Oregon smoker other than Williams smoked and sustained injuries *in reliance on the alleged fraud*. At most, plaintiff introduced evidence that smoking per se injured non-parties. However, the mere act of selling cigarettes is lawful conduct. Plaintiff never connected the injuries of non-parties to the fraud alleged in this case."

(Emphasis in original.)

In essence, Philip Morris is claiming that one cannot reasonably infer that anyone was actually fooled by its 40-year advertising campaign directed to thousands of Oregonians. Yet even the simplest assessment of human nature, viewed in light of the designedly addictive properties of cigarettes, tells any reasonable person that those lies would have been very persuasive. We think that such an appreciation of human nature fairly may be attributed to jurors, including the ones who heard this case. Moreover, Philip Morris's own conduct belies its protestations. As a for-profit corporation, it would not spend over 40 years of time, effort, and money to deceive people, unless it thought it was succeeding.

## II. PROCEDURAL POSTURE

At trial, the jury found in favor of plaintiff on both the negligence and fraud claims, and it awarded compensatory damages of $821,485.50—$21,485.80 in economic damages and $800,000 in noneconomic damages.

As to the negligence claim, the jury found Williams 50 percent responsible for the damages. The jury declined to award any punitive damages respecting that claim. As to the fraud claim, however, the jury awarded punitive damages of $79.5 million.

The trial court significantly reduced the amounts awarded to the plaintiff. The court "capped" the noneconomic damages at $500,000 pursuant to *former* ORS 18.560 (1999), *renumbered as* ORS 31.710 (2003), thereby producing a total compensatory damage award of $521,485.80.[2] The court also reduced the punitive damage award. The court did conclude that $79.5 million "was within the range a rational juror could assess based on the record as a whole and applying the Oregon common law and statutory factors." Nevertheless, the court concluded, the $79.5 million punitive damage award "was excessive under federal standards." The trial court therefore reduced the punitive damage award to $32 million.

Both plaintiff and Philip Morris appealed to the Court of Appeals. In *Williams I*, the Court of Appeals reversed the trial court on plaintiff's appeal and reinstated the $79.5 million punitive damage award. 182 Or App at 72. It affirmed on Philip Morris's cross-appeal. *Id.* at 47. The court later adhered to its opinion on reconsideration. *Williams*, 183 Or App at 197. This court denied review. 335 Or 142, 61 P3d 938 (2002).

The United States Supreme Court then granted certiorari, vacated the Court of Appeals' judgment, and remanded the case to the Court of Appeals for that court to reconsider the amount of the punitive damages award in light of *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538

---

[2] There is no issue in this case as it comes before us respecting the propriety of the trial court's application of *former* ORS 18.560.

US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003). *Philip Morris USA Inc. v. Williams*, 540 US 801, 124 S Ct 56, 157 L Ed 2d 12 (2003). The Court of Appeals did so in *Williams II*, again reversing on plaintiff's appeal and affirming on Philip Morris's cross-appeal. We allowed review.

## III.   ISSUES ON REVIEW

On review, Philip Morris asks us to consider four issues, which it states as follows:

"A.   Is a defendant entitled to have the jury instructed that any award of punitive damages must bear a reasonable relationship to the harm caused to the plaintiff and that punitive damages cannot be imposed for alleged harm to non-parties?

"B.   Are the punitive damages assessed in this case unconstitutionally excessive in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution?

"C.   Must a plaintiff prove receipt of and reliance upon the defendant's allegedly fraudulent communications when he or she claims that a defendant committed fraud by communicating a false impression to the general public through mass media?

"D.   Does the Federal Cigarette Labeling and Advertising Act, 15 USC §§ 1331 *et seq.*, preempt the 'false impression' theory relied upon by the Court of Appeals, which is based in part upon a defendant's failure to disclose information beyond that prescribed by the congressionally mandated warnings?"

We will not consider the third and fourth issues. This court earlier declined review of all the issues decided in *Williams I*. The appeal remained alive only because of, and to the extent that, the United States Supreme Court later directed the Court of Appeals to reconsider its decision respecting the amount of punitive damages in light of *Campbell*. The Court of Appeals performed that limited function in *Williams II*, and we allowed review of *that* decision. We decline to go beyond the Supreme Court's mandate, and the Court of Appeals' opinion in *Williams II*, to consider

issues that this court previously determined were not review-worthy. *See* ORAP 9.20(2) (this court's opinion need not address every question presented on review).

The Supreme Court's decision in *Campbell* clearly relates to the second issue presented by Philip Morris. Philip Morris asserts that *Campbell* also relates to the first issue, regarding jury instructions. Because of that, and because the Court of Appeals addressed both issues in *Williams II*, we will consider those issues here.

## IV. DISCUSSION

A. *Overview of* State Farm v. Campbell

We begin by reviewing the United States Supreme Court's opinion in *Campbell*.

The punitive damage award at issue in *Campbell* arose from an insured's action against an insurer for bad faith, fraud, and intentional infliction of emotional distress. 538 US at 414. Campbell, the insured, had caused an automobile accident that killed one person and permanently disabled another. *Id.* at 412-13. When Campbell was sued, Campbell's insurer, State Farm, chose to contest liability. *Id.* at 413. It refused settlement offers that were within policy limits and took the case to trial despite the advice of one of its own investigators, in the process assuring Campbell and his wife that they would face no personal liability. *Id.* When the jury returned a verdict substantially above the policy limits, State Farm initially refused to cover the excess, telling the Campbells to put "for sale" signs on their property. *Id.* State Farm also refused to post a supersedeas bond to appeal the verdict. *Id.*

In their action against State Farm, the Campbells introduced evidence that State Farm's decision to try the case was part of a nationwide effort to limit payouts on insurance claims. *Id.* at 415. The evidence "concerned State Farm's business practices for over 20 years in numerous States. Most of these practices bore no relation to third-party automobile insurance claims, the type of claim underlying the Campbells' complaint against the company." *Id.* The jury

awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages. *Id.* The trial court reduced the compensatory damages to $1 million and the punitive damages to $25 million. *Id.* On appeal, the Utah Supreme Court reinstated the $145 million punitive damage award. *Id.* The United States Supreme Court granted certiorari. *Id.* at 416.

The Court first noted that compensatory damages are intended to compensate for a loss, while punitive damages "are aimed at deterrence and retribution." *Id.* However, the Court noted, the Fourteenth Amendment's Due Process Clause prohibits imposing "grossly excessive or arbitrary punishments" on a tortfeasor. *Id.* A person must have fair notice, not just that the state will punish certain conduct, but also how severely it will do so. *Id.* at 417.

■       The Court identified two risks peculiar to punitive damages. First, although punitive damage awards are similar to criminal sanctions, defendants do not receive the procedural protections required of criminal trials. *Id.* Second, vague jury instructions can leave the jury with too much discretion in choosing the amount of punitive damages, allowing it to express preexisting biases or to rely too much on tangential or inflammatory evidence. *Id.* at 417-18. For those reasons, the Court had directed "[e]xacting appellate review" of a jury's punitive damage award, considering three "guideposts" identified in *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996):

> "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*Campbell*, 538 US at 418.

■       The Court then applied those guideposts. The first guidepost, the reprehensibility of defendant's conduct, represents " '[t]he most important indicium of the reasonableness of a punitive damages award.' " *Id.* at 419 (quoting *Gore*, 517 US at 575). In analyzing reprehensibility, courts should consider whether

"the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.* (citing *Gore*, 517 US at 576-77).

In analyzing that guidepost in *Campbell*, however, the Court did not itself focus on those five considerations. Instead, it concentrated on how evidence of out-of-state conduct and dissimilar conduct had skewed the reprehensibility analysis against State Farm. The state wrongly relied on such conduct, the Court ruled, because a state cannot punish a defendant for its lawful conduct in another state, or for conduct that "occurred outside [the state] to other persons." *Id.* at 421. In *Campbell*, most of the out-of-state conduct was lawful where it took place, and it was not connected to the harm to the Campbells. *Id.* at 422. Furthermore, the Court held, a state cannot punish a defendant for "dissimilar acts": "A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* at 423. In sum, the Court held that, because the Campbells showed "no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis." *Id.* at 424.

The second *Gore* guidepost examines the ratio between the punitive damage award and the actual or potential harm to the plaintiff. *Campbell*, 538 US at 424. The ratio, however, is no mechanical formula. *Id.* ("we have been reluctant to identify concrete constitutional limits on the ratio"); *id.* at 425 ("[w]e decline again to impose a bright-line ratio"); *id.* ("there are no rigid benchmarks that a punitive damage award may not surpass").

That said, the Court proceeded to give some guidance regarding the second guidepost. Twice in the past, the Court noted, it had suggested that a punitive damage award more than four times compensatory damages "might be close to the line of constitutional impropriety." *Id.* at 425 (citing

*Gore*, 517 US at 581, and *Pacific Mutual Life Insurance Co. v. Haslip*, 499 US 1, 23-24, 111 S Ct 1032, 113 L Ed 2d 1 (1991)). The Court also had noted previously that, for 700 years, legislatures had authorized double, treble, or quadruple damages as a sanction. *Campbell*, 538 US at 425 (citing *Gore*, 517 US at 581 & n 33). The Court concluded that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 US at 425.

> "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in [the] range of 500 to 1, or, in this case, of 145 to 1."

*Id.* (citation omitted).

The Court did acknowledge, however, that even those tentative ratios might be adjusted up or down. A greater ratio might comport with due process if " 'a particularly egregious act has resulted in only a small amount of economic damages,' " if " 'the injury is hard to detect,' " or if " 'the monetary value of noneconomic harm might have been difficult to determine.' " *Id.* at 425 (quoting *Gore*, 517 US at 582). With a "substantial" compensatory damage award, however, due process might require "a lesser ratio, perhaps only equal to compensatory damages." *Id.* But "[t]he precise award * * * must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

In applying the second *Gore* guidepost, the Court stated that there is "a presumption against an award that has a 145-to-1 ratio." *Id.* at 426. The Campbells had received a substantial compensatory damage award; they were injured economically, not physically; and State Farm paid the excess verdict before the Campbells sued them, so their economic injuries were minor. *Id.* Additionally, the outrage and humiliation that State Farm caused the Campbells may have been considered twice—once in the compensatory damage award and again in the punitive damage award. *Id.*

The Court also rejected several other factors that the Utah Supreme Court had identified in support of the punitive damage award. For example, the Utah Supreme Court had

pointed to State Farm's wealth. The Court concluded that wealth should not have been considered:

> "While States enjoy considerable discretion in deducing when punitive damages are warranted, each award must comport with the principles set forth in *Gore*. * * * The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award. *Gore*, 517 US at 585 ('The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business'); see also *id.* at 591 (Breyer, J., concurring) ('[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy * * *. That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as "reprehensibility," to constrain significantly an award that purports to punish a defendant's conduct')."

*Id.* at 427-28.

The third guidepost compares the punitive damage award to comparable civil and criminal penalties. *Id.* at 428. Criminal penalties, however, do not help as much in determining "the dollar amount of the award":

> "Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."

*Id.*

The comparable civil sanctions in *Campbell* fell well below the punitive damage award. The Court identified only one, a $10,000 fine for fraud. *Id.* The Utah Supreme Court had pointed to other, more substantive penalties, but they were all based on evidence of out-of-state and dissimilar conduct. *Id.*

In all, the Court in *Campbell* found the case "neither close nor difficult," *id.* at 418, and concluded that $145 million in punitive damages violated due process, *see id.* at 429

(concluding award was "irrational and arbitrary deprivation" of property). The Court suggested that the guideposts,

"especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages."

*Id.* However, the Court concluded, Utah state courts should calculate punitive damages in the first instance. *Id.* at 429.

With the foregoing principles in mind, we turn to the questions presented on review.

B. *The Trial Court's Refusal to Give Philip Morris's Proposed Jury Instruction No. 34*

■     Philip Morris first argues that the trial court erred in refusing to give its proposed jury instruction number 34. That instruction stated, in part:

"The size of any punishment should bear a reasonable relationship to the harm caused to Jesse Williams by the defendant's punishable misconduct. Although you may consider the extent of harm suffered by others in determining what that reasonable relationship is, you are not to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own in which other juries can resolve their claims and award punitive damages for those harms, as such other juries see fit."

In *Williams I*, the Court of Appeals concluded that that instruction was incorrect under state law. 182 Or App at 63-64. We agree. *See Parrott*, 331 Or at 563 (evaluating punitive damage award; "Because defendant's tortious conduct was a routine part of its business practice that it was unwilling to change, we also consider the potential injury that its misconduct may have caused to past, present, and future customers."). That is, the jury could consider whether Williams and his misfortune were merely exemplars of the harm that Philip Morris was prepared to inflict on the smoking public at large.

Philip Morris, however, contends that *Campbell* overrules state rules like the one set out in *Parrott*. Specifically, Philip Morris asserts that *Campbell* prohibits the state, acting through a civil jury, from using punitive damages to

punish a defendant for harm to nonparties.[3] In support of that argument, Philip Morris quotes the following from *Campbell*:

"Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis * * *. * * * Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains. *Gore, supra*, [517 US] at 593 (Breyer, J., concurring) ('Larger damages might also "double count" by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover')."

538 US at 423.

We think that Philip Morris takes the foregoing quoted material from *Campbell* out of context. The quote referred only to *dissimilar* acts and dissimilar claims; the Court intended to prohibit a punitive damage award from becoming a referendum on a corporate defendant's general behavior as a citizen. The full paragraph in *Campbell* states:

"For a more fundamental reason, however, the Utah courts erred in relying upon this and other evidence: The courts awarded punitive damages to punish and deter *conduct that bore no relation to the Campbells' harm*. A defendant's *dissimilar acts, independent from the acts upon which liability was premised,* may not serve as the basis for punitive damages. *A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.* Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis, but we have no doubt the Utah Supreme Court did that here. 65 P3d at 1149 ('Even if the harm to the Campbells can be appropriately characterized as minimal, the trial court's assessment of the situation is on target: "The harm is minor

---

[3] Philip Morris does not explain how its instruction summarizes its interpretation of *Campbell*. It is unclear to us how a jury could "consider" harm to others, yet withhold that consideration from the punishment calculus. If a jury cannot punish for the conduct, then it is difficult to see why it may consider it at all.

to the individual but massive in the aggregate" '). Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains. *Gore, supra,* [517 US] at 593 (Breyer, J., concurring) ('Larger damages might also "double count" by including in the punitive damages award some of the compensatory, or punitive, damages that subsequent plaintiffs would also recover')."

538 US at 422-23 (emphasis added).

Considering the foregoing material as a whole, we conclude that evidence of *similar* conduct against other parties may be relevant to a punitive damage award. The Court criticized the Utah courts only for allowing in evidence of *dissimilar* conduct:

"The Campbells have identified scant evidence of repeated misconduct *of the sort that injured them.* * * * Although *evidence of other acts need not be identical to have relevance in the calculation of punitive damages,* the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. * * * The reprehensibility guidepost *does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance,* which in this case extended for a 20-year period. In this case, because the Campbells have shown no conduct by State Farm *similar to that which harmed them,* the conduct that harmed them is the only conduct relevant to the reprehensibility analysis."

*Id.* at 423-24 (emphasis added). *See also id.* at 427 ("The failure of the company to report the Texas award is out-of-state conduct that, *if the conduct were similar,* might have had some bearing on the degree of reprehensibility, subject to the limitations we have described." (emphasis added)).

Philip Morris's proposed jury instruction would have prohibited the jury from "punish[ing] the defendant for the impact of its alleged misconduct on other persons," even if those other persons were Oregonians who were harmed by the same conduct that had harmed Williams, and in the same way. As we noted, that is not correct as an independent matter of Oregon law respecting the conduct of jury trials and instructions that are given to juries. Neither, as we read

*Campbell,* does it correctly state federal due process law. Because the proposed jury instruction did not accurately reflect the law, the trial court did not commit reversible error when it refused to give it. *See Hernandez v. Barbo Machinery Co.*, 327 Or 99, 106, 957 P2d 147 (1998) (trial court's refusal to give requested jury instruction "is no[t] error if the requested instruction is not correct in all respects").

Philip Morris also claims that the trial court committed reversible error because the jury instructions that *were* given did not accurately reflect some aspects of *Campbell's* holding. But Philip Morris did not preserve that argument before the Court of Appeals. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claimed error * * * is assigned as error in the opening brief * * *."); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991) (to preserve error, "the adversely affected party must have * * * raised the issue on appeal by an assignment of error in its opening brief"). Fairly read, Philip Morris's assignment of error in the Court of Appeals claimed only that the trial court erred in refusing to give requested instruction number 34. That narrow assignment of error did not give the Court of Appeals notice that it needed to consider any challenge to the instructions actually given.

Based on the foregoing discussion, we affirm the Court of Appeals on the first issue.

C. *The Punitive Damage Award and Federal Due Process*

On review of a punitive damage award under the Due Process Clause of the Fourteenth Amendment, a court must determine whether the punitive damage award is " 'grossly excessive.' " *Parrott*, 331 Or at 554 (emphasis deleted; citing *Gore,* 517 US at 568). Whether the verdict exceeds the gross excessiveness standard is a question of law. *Id.* at 555.

In *Parrott*, this court identified five factors to be considered to determine whether a punitive damage award is grossly excessive:

"[T]he range that a rational juror would be entitled to award depends on the following: (1) the statutory and common-law factors that allow an award of punitive damages for the specific kind of claim at issue; (2) the state interests that a

punitive damages award is designed to serve; (3) the degree of reprehensibility of the defendant's conduct; (4) the disparity between the punitive damages award and the actual or potential harm inflicted; and (5) the civil and criminal sanctions provided for comparable misconduct."

*Id.* (citations omitted). *Parrott* has been superseded somewhat by *Campbell*, but the last three *Parrott* factors are, of course, the *Gore* guideposts as they have been further elucidated by *Campbell*. We consider only those guideposts in the following analysis.

■        The first guidepost directs us to consider, based on the facts contained in the record, how reprehensible Philip Morris's conduct was. As noted, we consider whether:

"the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Campbell*, 538 US at 419 (citing *Gore*, 517 US at 576-77). And, as we have explained, the jury, in assessing the reprehensibility of Philip Morris's actions, could consider evidence of similar harm to other Oregonians caused (or threatened) by the same conduct.

■        Again, we construe all facts in favor of plaintiff, the party in whose favor the jury ruled. Doing so, there can be no dispute that Philip Morris's conduct was extraordinarily reprehensible. Philip Morris knew that smoking caused serious and sometimes fatal disease, but it nevertheless spread false or misleading information to suggest to the public that doubts remained about that issue. It deliberately did so to keep smokers smoking, knowing that it was putting the smokers' health and lives at risk, and it continued to do so for nearly half a century.

Philip Morris's fraudulent scheme would have kept many Oregonians smoking past the point when they would otherwise have quit. Some of those smokers would eventually become ill; some would die. Philip Morris's deceit thus would, naturally and inevitably, lead to significant injury or death.

Although it weighs less in our analysis, we also note that Philip Morris harmed a much broader class of Oregonians. Every smoker tricked by its scheme, even those who never got ill, kept buying cigarettes — taking money out of their pockets and putting it into the hands of Philip Morris and other tobacco companies. And every one of those smokers *risked* serious illness or death for as long as they remained deceived.

Of the five reprehensibility factors listed in *Gore* and recited—if not precisely used—in *Campbell*, four certainly are met here. The harm to Williams was physical—lung cancer cost Williams his life. Philip Morris showed indifference to and reckless disregard for the safety not just of Williams, but of countless other Oregonians, when it knowingly spread false or misleading information to keep smokers smoking. Philip Morris's actions were no isolated incident, but a carefully calculated program spanning decades. And Philip Morris's wrongdoing certainly involved trickery and deceit.[4] We conclude, then, that the first *Gore* guidepost favors a very significant punitive damage award.

We also conclude that the third *Gore* guidepost—comparable civil or criminal sanctions—favors plaintiff. In examining that guidepost, however, we believe that it is important to correct two errors that the Court of Appeals committed in applying it.

In *Williams I*, the Court of Appeals suggested that, because the comparable sanctions guidepost was about notice to a prospective defendant, "the established Oregon law of punitive damages, including ORS 30.925(2)," gave Philip Morris adequate notice here. 182 Or App at 72. That was not correct.

---

[4] Only one factor arguably is not met: There is no evidence that Williams was especially financially vulnerable.

Plaintiff argues that Williams was vulnerable in another way, because he was addicted to cigarettes and so more susceptible to Philip Morris's deceptive message. *Gore* indirectly suggests that reprehensibility may include other sorts of vulnerability than financial. *See* 517 US at 576 (suggesting that higher punitive damages are appropriate, even though the injury is *solely economic*, if "the target is financially vulnerable"). However, as we will discuss, we would affirm this punitive damage award even if that factor was not met.

■        Courts consider comparable sanctions for two rea-
sons. First, comparable sanctions suggest a legislative deter-
mination about what constitutes an appropriate sanction for
the conduct, a determination that is entitled to "substantial
deference." *Gore*, 517 US at 583 (internal quotation marks
and citation omitted). Second, comparable sanctions may
give a defendant fair notice of the penalties that the conduct
may carry. *Id.* at 584 ("None of these statutes would provide
an out-of-state distributor with fair notice that the first vio-
lation—or, indeed the first 14 violations—of its provisions
might subject an offender to a multimillion dollar penalty.").

        Those reasons explain why we conclude that the
Court of Appeals misunderstood the guidepost. Neither
Oregon law generally, nor ORS 30.925(2) specifically,[5] sug-
gest how severely the state may choose to punish Philip
Morris's conduct. Thus, they do not independently provide a
legislative standard entitled to substantial deference. If the
Court of Appeals' analysis were correct, then the third *Gore*
guidepost would always support *any* punitive damage award,
*i.e.*, the mere existence of the award would justify itself auto-
matically, regardless of the amount awarded. That reasoning
is circular, and we reject it.

---

[5] ORS 30.925 provides, in part:

   "(2) Punitive damages, if any, shall be determined and awarded based
upon the following criteria:

   "(a) The likelihood at the time that serious harm would arise from the
defendant's misconduct;

   "(b) The degree of the defendant's awareness of that likelihood;

   "(c) The profitability of the defendant's misconduct;

   "(d) The duration of the misconduct and any concealment of it;

   "(e) The attitude and conduct of the defendant upon discovery of the
misconduct;

   "(f) The financial condition of the defendant; and

   "(g) The total deterrent effect of other punishment imposed upon the
defendant as a result of the misconduct, including, but not limited to, punitive
damage awards to persons in situations similar to the claimant's and the
severity of criminal penalties to which the defendant has been or may be
subjected."

   Of course, those criteria were established without the benefit of the *Campbell*
decision, and may be applied only to the extent that they comport with that
decision.

In *Williams I*, the Court of Appeals also suggested that the comparable sanctions guidepost does not "play[ ] a major role one way or the other," because it concluded that there were no comparable civil penalties and that criminal penalties were not truly comparable. 182 Or App at 72. Although it is not clear to us that the foregoing statement correctly interprets and applies the law as *Campbell* now explicates that law, we need not pursue that issue definitively here. That is true, because applying the comparable sanctions guidepost involves more than just asking whether the dollar amount of the sanction equals or exceeds the punitive damage award. *Campbell* proves that. There, the most relevant civil sanction was $10,000; the Court found that civil sanction was "dwarfed" by the $145 million punitive damage award. 538 US at 428. Yet the Court approved a punitive damage award "at or near the amount of compensatory damages," *i.e.*, an award somewhere around $1 million. *Id.* at 429. And a $1 million punitive damage award was still 100 times the comparable sanction.

■■ So far as we can discern from *Campbell*, then, the "comparable sanctions" guidepost requires three steps. First, courts must identify comparable civil or criminal sanctions. Second, courts must consider how serious the comparable sanctions are, relative to the universe of sanctions that the legislature authorizes to punish inappropriate conduct. Third, courts must then evaluate the punitive damage award in light of the relative severity of the comparable sanctions. The guidepost may militate against a significant punitive damage award if the state's comparable sanctions are mild, trivial, or nonexistent. However, the guidepost will support a more significant punitive damage award when the state's comparable sanctions are severe.

We turn, then, to consider the facts of this case, in light of the guideposts and the Fourteenth Amendment. If there are comparable civil sanctions, the parties did not cite them to us and we have not found them by independent investigation.

■ There are what we consider to be comparable criminal sanctions, but we must exercise care when relying on them. As the Court took pains to caution in *Campbell*:

"The existence of a criminal penalty does have [a] bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."

538 US at 428. That admonition is important, of course. But the basis for holding that Philip Morris's actions in this case compare to a familiar crime is not speculative or remote. Viewing the facts in the light most favorable to plaintiff, Philip Morris's actions, under the criminal statutes in place at the beginning of its scheme in 1954, would have constituted manslaughter. *See* ORS 163.040 (1953).[6] Today, its actions would constitute at least second-degree manslaughter, a Class B felony. *See* ORS 163.125(1)(a).[7] Individuals who

---

[6] ORS 163.040 (1953) provided, in part:

"(2) Any person who, in the commission of * * * a lawful act without due caution or circumspection, involuntarily kills another, is guilty of manslaughter. * * *

"(3) Every killing of a human being by the act, procurement or culpable negligence of another, when the killing is not murder in the first or second degree, or is not justifiable or excusable or negligent homicide as provided in ORS 163.090 [negligent homicide by operation of motor vehicle], is manslaughter."

[7] The Oregon statutes generally define criminal homicide as follows:

"A person commits criminal homicide if, without justification or excuse, the person intentionally, knowingly, recklessly or with criminal negligence causes the death of another human being."

ORS 163.005(1).

Second-degree manslaughter is a specific category of criminal homicide:

"(1) Criminal homicide constitutes manslaughter in the second degree when:

"(a) It is committed recklessly[.]

"* * * * *

"(2) Manslaughter in the second degree is a Class B felony."

ORS 163.125.

Reckless conduct is defined in ORS 161.085(9):

" 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and

commit Class B felonies may face up to 10 years in prison and a fine of up to $250,000. ORS 161.605(2) (term of imprisonment); ORS 161.625(1)(c) (fine). Corporations that commit a felony of any class may be fined up to $50,000, or required to pay up to twice the amount that the corporation gained by committing the offense. ORS 161.655(1)(a) and (3). Thus, the possibility of severe criminal sanctions, both for any individual who participated and for the corporation generally, put Philip Morris on notice that Oregon would take such conduct very seriously.[8] We conclude that the third guidepost, like the first, supports a very significant punitive damage award.

The same cannot be said of the second *Gore* guidepost. As noted, that guidepost considers the ratio between the punitive damage award and the compensatory damage award. The numerator of the ratio is fixed by the punitive damage award: $79.5 million.

To determine the denominator of the ratio, we consider not only the harm actually suffered by plaintiff, but also the potential harm to plaintiff. *See Campbell*, 538 US at 418 ("actual or potential harm suffered by the plaintiff"); *id.* at 424 (ratio "between harm, or potential harm, to the plaintiff and the punitive damages award"). Plaintiff suffered relatively small economic damages for Williams's wrongful death—less than $25,000. However, that low figure occurred only because Williams died shortly after being diagnosed with cancer. If Williams had lived long enough to incur substantial medical bills, for example, economic damages could easily have been 10 or more times the amount awarded here. Only chance saved Philip Morris from a much higher compensatory damage award.[9]

---

consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

[8] The fines and periods of imprisonment have changed over the many years that Philip Morris carried out its scheme. In 1953, for example, manslaughter carried a much longer prison term (15 years), but a much lower fine ($5,000). ORS 163.080 (1953). The point, however, is that reckless conduct like Philip Morris's, when it resulted in death (as it did here), always has constituted a criminal act to which attached a severe potential criminal penalty.

[9] One sentence in *Campbell* suggested that a small award of " '*economic* damages' " might, when combined with particularly egregious conduct, justify a higher ratio. 538 US at 425 (quoting *Gore*, 517 US at 582; emphasis added).

■     In analyzing the ratio of punitive to compensatory damages, the Court of Appeals also added to the compensatory damages calculus the estimated harm to others. *Williams II*, 193 Or App at 562 (estimating that 100 Oregonians had been harmed by Philip Morris's scheme and concluding that ratio was therefore less than 4:1).

Using harm to others as part of the ratio may have been correct under the plurality opinion in *TKO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 460, 113 S Ct 2711, 125 L Ed 2d 366 (1993) (Stevens, J., joined by Rehnquist, C. J., and Blackmun, J.) (relationship between actual and punitive damages should consider "the possible harm to other victims that might have resulted if similar future behavior were not deterred"). However, it no longer appears to be permissible (if it ever was) to factor in that consideration. Although *Campbell* held that similar acts could bear on reprehensibility (discussed above), it now appears that harm to others should not be considered as part of the ratio guidepost. *See* 538 US at 426-27 ("Since the Supreme Court of Utah discussed the Texas award when applying the ratio guidepost, we discuss it here. The Texas award, however, should have been analyzed in the context of the *reprehensibility guidepost only*" (emphasis added)); *see also id.* at 427 (had Texas award involved similar conduct, it "might have had some bearing on the degree of reprehensibility"); *Gore*, 517 US at 582-83 (Court used 500:1 as ratio, although Court noted in footnote 35 that ratio would have been 35:1 if damages to other Alabama consumers had been included). From the foregoing, we conclude that the ratio guidepost considers only harm to the plaintiff. *See Campbell*, 538 US at 425 (precise award must be based on "the defendant's conduct and the harm *to the plaintiff*" (emphasis added)); *id.* at 426

---

We conclude, however, that the Court meant compensatory damages generally, not economic damages specifically. *See id.* ("The converse is also true, however. When *compensatory* damages are substantial, then a lesser ratio * * * can reach the outermost limit of the due process guarantee." (emphasis added)); *see also id.* at 426 (expressing concern that compensatory damages might have included outrage or humiliation component duplicated in punitive damage award). That accords with *Gore*, 517 US at 582 ("[L]ow awards of *compensatory* damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." (emphasis added)).

(punishment must be "reasonable and proportionate to the amount of harm *to the plaintiff* and to the general damages recovered" (emphasis added)).

There also is some imprecision regarding what amount we should use for noneconomic damages—is it the $800,000 awarded by the jury, or the $500,000 awarded by the trial court after applying the statutory cap? We need not decide between the "capped" or "uncapped" figure, however, because it makes no difference here. Either way, the second *Gore* guidepost is not met. All arguable versions of the ratios substantially exceed the single-digit ratio (9:1) that the Court has said will apply in the usual case. *See Campbell*, 538 US at 425 (so stating).

■        In *Williams II*, the Court of Appeals also relied on Philip Morris's wealth to conclude that the jury's punitive damage award did not violate due process. 193 Or App at 563. Philip Morris objects that *Campbell* prohibits using wealth in that way. We agree. Wealth "cannot justify an otherwise unconstitutional punitive damages award." *Campbell*, 538 US at 427. If a punitive damage award is grossly excessive under *Gore* and *Campbell*, then the defendant's wealth will not make it constitutional. In short, wealth is not a fourth *Gore* guidepost.

■        However, *Campbell* did not otherwise remove wealth from the punitive damage equation, as Philip Morris asserts. A jury still may levy a higher punitive damage award against a wealthy defendant, as long as the final punitive damage award does not exceed the constitutional limits established by the three *Gore* guideposts. *Id.* at 427 (wealth "cannot justify an *otherwise unconstitutional* punitive damages award," indicating that punitive damage award could be constitutional even though jury considered wealth (emphasis added)); *see id.* at 428 (wealth is not " 'unlawful or inappropriate' " factor (quoting *Gore*, 517 US at 591 (Breyer, J., concurring))). Consistently with the foregoing, Oregon law specifically permits a jury to consider a defendant's financial condition when it imposes a punitive damage award. ORS 30.925(2)(f).

Of the three *Gore* guideposts, then, two support a very significant punitive damage award. One guidepost—the

ratio—cuts the other way. In the end, we are left to use those competing tools to assess whether the jury's punitive damage award was not "grossly excessive" and therefore should be reinstated.

■      The *Gore* guideposts are not bright-line tests. *See, e.g., Campbell*, 538 US at 425 ("there are no rigid benchmarks that a punitive damages award may not surpass"); *see also Gore*, 517 US at 582 ("we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula"). In other words, the guideposts are only that — guideposts. *Gore* also referred to them as indicia. 517 US at 575 (reprehensibility is "most important indicium"); *id.* at 580 (ratio is "second and perhaps most commonly cited indicium"); *id.* at 583 (comparable sanctions "provides a third indicium for excessiveness"). *Campbell* specifically contemplated that *some* awards exceeding single-digit ratios would satisfy due process. *See id.* at 425 ("in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process"). Single-digit ratios may mark the boundary in ordinary cases, but the absence of bright-line rules necessarily suggests that the other two guideposts—reprehensibility and comparable sanctions—can provide a basis for overriding the concern that may arise from a double-digit ratio.

And this is by no means an ordinary case. Philip Morris's conduct here was extraordinarily reprehensible, by any measure of which we are aware. It put a significant number of victims at profound risk for an extended period of time. The State of Oregon treats such conduct as grounds for a severe criminal sanction, but even that did not dissuade Philip Morris from pursuing its scheme.

In summary, Philip Morris, with others, engaged in a massive, continuous, near-half-century scheme to defraud the plaintiff and many others, even when Philip Morris always had reason to suspect—and for two or more decades absolutely knew—that the scheme was damaging the health of a very large group of Oregonians—the smoking public—and was killing a number of that group. Under such extreme and outrageous circumstances, we conclude that the jury's

$79.5 million punitive damage award against Philip Morris comported with due process, as we understand that standard to relate to punitive damage awards. It follows that the Court of Appeals correctly held that the trial court should have entered judgment against Philip Morris for the full amount of the jury's punitive damage award.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.